**UNITED STATES CASUALTY COMPANY, Plaintiff,**

v.

**NOLAND COMPANY, Inc., Defendant,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Third-Party Defendant.**

**No. C-37-WS-66.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.

May 27, 1968.

W. F. Maready and G. D. Humphrey, Jr., Winston-Salem, N. C., for plaintiff.

Charles H. Sedberry and Alfred L. Purrington, Raleigh, N. C., for defendant.

Luke Wright, Greensboro, N. C., for third party defendant.

## MEMORANDUM OPINION

GORDON, District Judge.

This case is before the Court on motions for summary judgment filed by the plaintiff, United States Casualty Company, and the defendant, Noland Company, Inc., and is a controversy between the plaintiff, a surety company, which bonded certain construction contracts for a now defunct electrical construction company, and the defendant, a wholesale distributor who supplied the electrical equipment on account to the defunct electrical construction company. The dispute is over the application of funds from construction jobs bonded by the plaintiff. The plaintiff asserts that funds from its jobs were improperly applied by the defendant to pay for supplies for jobs bonded by another surety company, the third party defendant in this action. The defendant, Noland Company, Inc., asserts that this has not been proved by the evidence, and even if proved, is not the law in this case.

The following facts are not in substantial dispute:

### Findings of Fact

1. United States Electric Company, Inc., (Electric), at all times pertinent was a North Carolina corporation organized in 1961 with its principal office and place of business in High Point, North Carolina. Electric, now bankrupt, and not a party to this action, was in the business of constructing the electrical systems for various building projects around North Carolina. As such, Electric was known in the trade as an "electrical contractor," because Electric bid on the portions of these building contracts dealing with electricity. A major portion of its work was on the construction of public buildings.

2. On thirty-five projects, during the time under consideration, United States Electric Company was required to give a surety bond conditioned upon payment for all labor and materials reasonably required for use in the performance of its part of the contract. Seventeen of such contracts entered into by Electric before September 15, 1963, were bonded by Hartford Accident & Indemnity Company (Hartford). Eighteen of the contracts were entered into after September 15, 1963, and were bonded by plaintiff, U. S.

Casualty Company (Casualty). During this period, Electric contracted to do more than forty projects which were not bonded.

3. Defendant, Noland Company, Inc., (Noland), is a Virginia corporation doing business as a wholesale distributor of electrical and plumbing supplies in numerous states in the southeastern United States, including North Carolina. Noland was one of the several suppliers who sold and delivered electrical supplies to Electric for use in the performance of the seventy-five contracts in which Electric was engaged.

4. In October and November of 1962, Electric began to go into debt at a substantially greater rate to the Noland Company than it had for the previous four or five months, as reflected in the accounts receivable trial balances of Noland. It was about this time that John C. Hayworth became connected with Electric as an "inside man:" the man in the office who supervised the estimation and bidding on the construction contracts. The Noland records began to reflect also an increase in the amount of Electric's debt over thirty days past due. Until January 31, 1963, Electric's debt to Noland increased at a rate something less than 10 per cent per month. However, one month later the debt began jumping at the rate of 30 per cent per month and accounts became sixty days past due.

5. By June 30, 1963, Electric owed Noland over $82,000.00, of which over $8,000.00 was ninety days past due. During July and August, 1963, the total indebtedness remained around $80,000.00, but the amounts past due sixty and ninety days were steadily increasing. During September and October, 1963, Electric appeared to be holding its own in keeping the debts overdue sixty and ninety days down to the previous levels. However, the amount past due thirty days increased to a total of over $68,-000.00.

6. By July, 1963, the district credit manager of Noland had became aware of the increase in the Electric account. He stated that he only became "concerned" about the account in "late '63."

7. The plaintiff, Casualty, began to issue the surety bond for Electric jobs on September 15, 1963. Around this time Hartford and Electric had a misunderstanding on the bond on one of the electric jobs and Hartford stopped bonding Electric jobs. On November 21, 1963, the bond superintendent of Casualty requested financial information about Electric from the Noland Office in Winston-Salem. Mr. Futrell, the local credit manager for Noland in Winston-Salem, replied, obviously using the figure found on the October 31, 1963, trial balance, that the amount owing at the present time was $76,440.59, that his general opinion of Electric was that it was "aggressive and capable," and his response to the question "Method of Payment (Prompt, slow)?" was "job basis."

8. By February 29, 1964, Noland's accounts receivable from Electric had grown to over $95,000.00, with over $69,-000.00 thirty days past due, $67,000.00 sixty days past due, and over $40,000.00 ninety days past due. By July 31, 1964, the Electric account had grown to over $143,000.00, with $90,000.00 thirty days past due, $67,000.00 sixty days past due, and close to $50,000.00 ninety days past due.

9. At this juncture, Casualty's bond superintendent again wrote the Noland office in Winston-Salem, on August 5, 1964, relative to issuing suretyship for Electric. This time the Noland credit manager responded, apparently using the figure on the July 31, 1964, trial balance, that the amount owing at the present time was $143,615.65, and that the method of payment was "slow." In response to the question "Have you ever had occasion to limit their credit purchases?" his response was "fulfilling existing commitments." The Noland credit manager's general opinion of Electric was "Know the electrical business—apparently need counseling on financial side."

10. As the Electric accounts grew increasingly large in late 1963 and early 1964, Noland began to press Electric for

the payment of those accounts running past due. In June and July, 1964, Noland put pressure on Electric to pay up certain jobs or Noland would have to seek its protection under the surety bonds. This would have meant that the surety company would be apprised of the financial straits of Electric. Noland was merely trying to protect itself. This led to Electric's paying off these old accounts out of funds which partially came from jobs distinct from those giving rise to these old accounts. Thus, money coming from jobs bonded by Casualty was used to pay debts to Noland which had arisen on Hartford jobs. Noland's own local credit manager stated that he was more interested in getting money paid on the accounts than where the money came from. Therefore, Noland had reason to know that the funds being paid on the old accounts had a source distinct from the job giving rise to the old account. Noland, thus, had notice that funds were being misapplied to pay for jobs distinct from those from which the funds came. This confusion of job source and payment on account was contrary to the normal procedure in the construction trade. The normal procedure is to be paid on a "job basis:" the supplier gets paid for supplies used on a particular job out of the funds and progress payments coming to the contractor from that particular job.

11. In early August, 1964, Casualty began to realize that Electric was in trouble. Casualty discovered that Electric had assigned some of its accounts receivable to a factor. One supplier had put Electric on a "cash only" basis. It was at this time on August 5, 1964, that Casualty sent the inquiry to Noland. On August 12, 1964, Casualty sent telegrams to all owners of the Electric jobs directing the owners to pay no more funds to Electric pending further investigation. On August 19, 1964, representatives of Casualty met with Electric representatives in an attempt to determine as much as possible the financial condition of Electric. The net job breakdown at that time showed anticipated profits of $27,000.00 on the jobs then outstanding.

Based on the information it gathered at this meeting, Casualty released the funds which had been frozen by the prior telegrams. However, Casualty employed A. M. Pullen & Company, Accountants, to do an examination of the books of the Electric Company. This preliminary examination showed in early November, 1964, that Electric had a net deficit on September 30, 1964, of close to $200,000.00. Discussions between the parties followed. On November 18, 1964, Mr. Hayworth of Electric wrote the credit manager of Noland Company to request reapplication of funds which Mr. Hayworth had previously allocated to the wrong jobs. Noland refused to reallocate these payments as requested.

12. At this juncture, Casualty and Hartford took charge of their respective jobs, or those which they had bonded, in an effort to reduce their liability on the jobs. Hartford had five or six jobs close to completion. On December 31, 1964, Noland gave Hartford a release upon the payment of $3,223.84. On February 17, 1965, Noland gave Hartford a release upon the payment of $11,815.56. At the end of December, two more releases were given by Noland to Hartford in the amounts of $16,761.75 and $2,947.53.

### Discussion

Jurisdiction in this case is clearly established on the basis of diversity of citizenship, the plaintiff and defendants being citizens of different states and the amount in controversy being clearly in excess of $10,000.00. 28 U.S.C. § 1332. It is fundamental that in a diversity case, the law of the State governs on the substantive issues in the case.

The substantive issue, which is the residue of much boiling in this case, is simply stated:

Does the supplier of materials on construction contracts have a duty to the surety on those contracts to apply funds derived from those contracts only to discharge the debts for the materials supplied to those particular contracts, even though the contractor-debtor may direct

that the funds be applied to debts for materials supplied on entirely different contracts, bonded by a different surety?

■ The North Carolina Supreme Court has apparently never decided this precise issue. This fact is not sufficient to deter a federal court from exercising its jurisdiction to decide a diversity case properly brought before it for decision. Akin v. Louisiana National Bank of Baton Rouge, 5 Cir., 322 F.2d 749 (1963); Preston v. Aetna Life Ins. Co., 8 Cir., 174 F.2d 10 (1949); Hachmann v. Mayo Clinic, 150 F.Supp. 468 (D.C.Minn.1957).

■■ The North Carolina Supreme Court has, however, expressed its opinion on this issue by way of dicta in a recent case involving materialmen's liens. Rural Plumbing & Heating, Inc. v. Hope Dale Realty, Inc., 263 N.C. 641, 140 S.E. 2d 330 (1965). The court stated the general principle of law applicable to the issue of the application of payments which the debtor makes to the creditor where there is no third party or surety, as follows:

"It is a well settled principle of both the common and civil law, which seems to be universally applied, that where a debtor who owes a number of debts to a creditor, makes a payment to the creditor, he has the right at the time of the payment to specify the debt or debts to which the payment will be applied, and if he fails to do so, the creditor may make the application. If the parties fail to make an application to a specific debt or debts, the duty to do so devolves upon the court. The rationale for the rule is that up to the time of payment, the money is the property of the debtor, and being such may be applied as he sees fit."

Where there is a third party or surety, however, the court states that this general rule is subject to qualification, as follows:

"This general rule as to application of payments is subject to the qualification, apparently adopted in a majority of the jurisdictions, that where money is paid by a contractor or the seller of property to a mechanic or materialman out of funds received by the contractor or seller of property from an owner or purchaser whose property is subject to a mechanics' or materialmen's lien, or both, and the purpose of the payment to the contractor or seller was to discharge the indebtedness against a specific house, the mechanic or materialman must apply the payment to discharge the indebtedness if he had knowledge of the source and purpose of the payment. Northern Virginia Savings & Loan Ass'n v. J. B. Kendall Co., 205 Va. 136, 135 S.E.2d 178; Farr v. Weaver, 84 W.Va. 182, 99 S.E. 395; 36 Am.Jur., Mechanic's Liens, §§ 227 & 228; 40 Am.Jur., Payment § 123. (Deletions in the citation by the court).

Thus, the North Carolina Supreme Court speaks favorably about the qualification to the general rule as being one favored by a majority of the jurisdictions. A review of the cases cited by that court reveals that the North Carolina Supreme Court copied the paragraphs setting out the qualification almost verbatim from the *Northern Virginia* case cited first, and then picked up the cases and citations to textual treatments cited after the statement in the *Northern Virginia* case. The *Farr* case and the textual treatments cited clearly stand for and affirm the soundness of this qualification to the general rule. The text of 40 Am.Jur., Payment, § 123, refers to creditors and debtors in general, and contains a cross-reference to 40 Am.Jur., Payment, § 148, which deals specifically with the law where there is a surety involved, as in this case. This latter section states the law to be as follows:

"§ 148. *Source of funds as material.* The general rule that a surety cannot control the application of a payment is applicable solely in those cases where the principal makes payment from funds which are his own and are free from any equity in favor of the surety to have the money applied in payment of the debt for which the surety is liable. * * * [W]here the

money paid or property delivered by the principal to the creditor is the identical money or property for the payment or delivery of which the guarantor or surety is bound, or the payment is made with the proceeds or fruits of the very contract, business, or transactions covered by the obligation of the surety or guarantor, the latter is not bound by an application of the payment or property to some other debt of the principal, at least, if the source of the funds is known to the creditor or person receiving the payment; in such case the surety or guarantor is equitably entitled to have the payment made or the property delivered applied to the discharge of the debt, or the liquidation of the obligation, for which he is bound. There is a conflict in the cases as to whether the equity of the surety, arising from the fact that the payments were made with funds derived by the principal from the very contract or transaction on account of which the bond was given, will prevail against the application made by a debtor, or by the creditor, in the absence of knowledge by the latter of the source of the fund with which the payment is made. In some jurisdictions the view obtains that even in the absence of any knowledge on the part of the creditor of the source of the payment, the surety's equity will prevail. Other cases, however, take the view that the application made by the debtor to another debt will be protected if the creditor acted in good faith and in ignorance of the source of the fund with which the payment was made."

The latter lines of authority in the above quotation have no application in this case since this Court has found as a fact that the creditor-supplier here had knowledge, or had reason to have knowledge, of the source of funds paid to it by Electric.

The above quoted section from American Jurisprudence, in part, is cited in St. Paul Fire & Marine Ins. Co. v. United States for Use of Dakota Elec. Supply Co., 8 Cir., 309 F.2d 22, cert. den. 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767. The *St. Paul* case is the latest in a long series of cases in which the basic issue presented in this case was decided by various United States Courts of Appeals. See also Columbia Digger Company v. Sparks, 9 Cir., 227 F. 780 (1915); United States for Use and Benefit of Crane Company v. Johnson, Smathers & Rollins, 4 Cir., 67 F.2d 121 (1933); R. P. Farnsworth & Co. v. Electrical Supply Co., 5 Cir., 112 F.2d 150, 130 A.L.R. 192 (1940), cert. den. 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454; United States for Use of Carroll v. Beck, 6 Cir., 151 F.2d 964, 166 A.L.R. 637 (1945). All of these cases, with the exception of the *Sparks* case, arose under the Miller Act, 40 U.S.C. § 270a et seq. The defendant-supplier in this case objects to the relevance of these Miller Act cases to this case since Federal law applied to those cases, not State law as required here. However, the distinctions the defendant would have drawn are without much difference or substance since the Miller Act was designed to give the supplier the same protection he would ordinarily receive under State lien laws: the bond protection the Miller Act prescribes is in lieu of those State liens. St. Paul, supra, 309 F.2d at page 24.

The *Crane* case arose in North Carolina, is similar on the facts to the instant case, and is very much in point. Judge Soper set out the general rule that the debtor can apply payments where he wishes and in the absence of such direction, the creditor may apply the payments, even though a surety is bound on one of the debts involved. However, he goes on to state the exception to this general rule, which the court follows in the *Crane* case:

"This rule, however, is not absolute when the surety involved has an equity in the money paid by the debtor, * * * Such an equity exists under the admitted facts of this case, in accordance with the rule announced by decisions in this and other federal circuits. We are in accord with these decisions

in so far as they hold that when a surety is bound on one of several debts of the principal debtor to a creditor, and a payment is made by the debtor to the creditor with the identical money for the payment of which the surety is bound, or with the proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety, the application of the payment to some other debt, with or without the direction or consent of the debtor, does not bind the surety; at least if the source of the funds is known to the creditor or person receiving the payment. The surety in such case is entitled to have the payment applied to the debt for which he is bound. United States v. American Bonding & Trust Co., 4 Cir., 89 F. 925; Columbia Digger Co. v. Sparks, 9 Cir., 227 F. 780; (further citations omitted)."

The factual proximity of the *Crane* case to the case at bar leading to its persuasiveness here is summarized in the last paragraph of that opinion. Clearly, the Fourth Circuit did not require that the funds be identified precisely, saying only that the evidence showed that a part of the funds from both projects was used to pay the expenses on the other. The Court also appears to place the burden of proof of proper allocation on the supplier.

■ Suffice it to say, that the rule in the federal courts which, while admittedly dealing with Miller Act cases, have considered the issue in this case, is that there is a duty to correctly apply funds where there is knowledge or reason to have knowledge of the source of the funds on the part of the supplier. See also Farnsworth, supra, and United States for Use of Carroll v. Beck, supra.

Cases which considered this issue apart from the Miller Act have substantially ruled the same way. The non-Miller Act case of Columbia Digger Co. v. Sparks, 9 Cir., 227 F. 780 (1915) found that there was a duty to apply funds to the accounts giving rise to the funds regardless of knowledge on the part of the supplier creditor. This is the extreme position which courts generally have been unwilling to take. The case discussed extensively by the plaintiff, Hiller and Skoglund, Inc. v. Atlantic Creosoting Co., Inc., et al., 40 N.J. 6, 190 A.2d 380 (1963) is a non-Miller Act case which is good authority for the plaintiff's position here except for the questionable feature that New Jersey had a "trust fund" act which made these construction funds subject to a trust to insure proper application of them to the proper account. The recent case from Florida, Broward County, Florida Commission for the Use & Benefit of G. E. Co. v. Continental Gas Co., 243 F.Supp. 118 (S.D.Fla.1965), seemed to be in agreement with the rule that the creditor was under a duty to apply payment to a particular debt on the source of which payment is a surety despite debtor's contrary direction, if the creditor knows, or was put on notice, of its origin. However, in this case, the court found that the evidence failed to establish that circumstances were such as to make it reasonable for the creditor to know from whence the funds came. Broward, supra, at pp. 123–124. The facts in our case were sufficient to put the creditor on notice that the funds it was applying were coming from sources foreign to the accounts to which the funds were being applied.

■ In addition, the Restatement of Contracts, § 388, adopts the requirement of a proper application where there is a third party surety and knowledge on the part of the creditor, even if the debtor directs the payment to be applied to the discharge of another debt. Therefore, the rule contended for by the plaintiff is one which North Carolina appears to have approved, at least by way of dicta, and one which finds support not only in Miller Act cases apparently without exception, but also in non-Miller Act cases which have dealt with this issue. This Court is constrained to follow the reasoning and authority of these cases, to require a reapplication of the funds in this case which were improperly allocated to the wrong accounts.

The motions for summary judgment are denied and contemporaneously herewith an order accordingly will be entered. An examination of the volumes of material on file with the Court is not persuasive that there is not a genuine issue of fact for resolution.

This rather lengthy Memorandum, unnecessary in ruling on the motions for summary judgment, is entered in the hope that an expression by the Court now might be helpful in ultimately resolving the issues in this very involved and complicated case.