**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellant,**

**v.**

**UNITED STATES of America for the Use of DAKOTA ELECTRIC SUPPLY COMPANY, a North Dakota Corporation, Appellee.**

**No. 16914.**

United States Court of Appeals
Eighth Circuit.

Oct. 18, 1962.

Rehearing Denied Nov. 19, 1962.

Edmund T. Montgomery, Minneapolis, Minn., made argument for appellant and Richard H. McGee, of McGee, Van Sickle & Hankla, Minot, N. D., and Richards, Montgomery, Cobb & Bassford, Minneapolis, Minn., were with him on the brief.

Philip B. Vogel, Fargo, N. D., made argument for appellee and Myron H. Bright of Wattam, Vogel, Vogel, Bright & Peterson, Fargo, N. D., was with him on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.

BLACKMUN, Circuit Judge.

This Miller Act case arises out of dormitory construction at the United States Air Force base at Minot, North Dakota. Tried to the court, it resulted in a judgment for the plaintiff supplier and against the defendant surety. The latter has appealed.

The general contractor was Joseph A. Bass Company. Its electrical subcontractor (hereinafter called "Schroeder") was John M. Schroeder, Inc. The supplier, or use plaintiff, is Dakota Electric Supply Company. The defendant St. Paul Fire and Marine Insurance Company is the surety on the payment bond required of Bass by § 1(a)(2) of the Act, 40 U.S.C. § 270a(a)(2).

The basic facts are not in dispute and, indeed, the parties have stipulated here that, with stated exceptions, the findings made by the trial court are acceptable as facts relevant to the issues of this appeal:

(a) The prime contract was executed by the United States and Bass on April 6, 1959. Bass and Schroeder then entered into the subcontract for the electrical installation. The subcontract called for a performance bond by Schroeder; this requirement, however, was waived by Bass, as the subcontract permitted, and the bond was not furnished.

(b) The electrical equipment ordered by Schroeder from Dakota for the Bass job arrived at the site on various dates between June 17, 1959, and March 24, 1960. It commanded a total agreed price of $6,705.98.

(c) During 1959 Schroeder was also engaged in electrical work on several other government and public contracts and on ventures of a private nature. It ordered materials for those projects from Dakota and other suppliers. Schroeder maintained at the First National Bank of Grand Forks a single general control bank account in which it deposited all payments received by it in the operation of its entire business. From this general account it disbursed operating expenses, payments to creditors, and transfers to another account it maintained for payroll. Although Schroeder kept a separate record for each of the several projects on which it was engaged and for its general inventory items, it did not maintain a separate bank account for each project.

(d) On various dates from August 1959 to March 1960 Bass made progress payments to Schroeder for labor and materials furnished to its job. These totaled more than $30,000. Schroeder deposited these payments in its general bank account. Later Bass made some direct payments for labor and materials in order to complete Schroeder's portion of the job.

(e) During the same period receipts of more than a million dollars were deposited in the Schroeder bank account. The Bass payments were thus about 3% of the total deposits.

(f) During the same period Schroeder made payments to Dakota aggregating in excess of $72,000. These were specifically designated by Schroeder for Dakota invoices other and older than those for the Bass contract. This was in line with Schroeder's policy, followed since its organization, of paying a supplier's oldest invoices first. Because of intervening withdrawals for operating expenses, repayment of bank loans, and the like, the Bass payments deposited in Schroeder's general account cannot be traced through that account to specific payments made from it by Schroeder to Dakota.

(g) Bass did not know that its progress payments were not being applied to Dakota's invoices for the Bass job. Although its checks for these payments carried references to the job, Bass designated no specific application of the progress payments.

(h) By the end of February 1960 Schroeder was insolvent. A trustee in bankruptcy was subsequently appointed for it. Dakota turned over to this trustee $30,000 (included in the $72,000 figure

mentioned above) which it had obtained from Schroeder in March after Dakota had learned of Schroeder's insolvency.

(i) After complying with the notice provisions of the Act, Dakota brought this suit in November 1960.

Dakota asserts that these facts add up to the classic situation which, when present in a Miller Act controversy, presents a case for recovery against the surety: Dakota supplied materials to a subcontractor engaged in the performance of a government contract; it did not receive payment for those materials; and it complied with the notice provisions of the Act.

This prompts us to make at this point some general observations before setting forth additional facts which the surety claims are significant:

1. Comments which appear in the authorities to the effect that a surety is a favorite of the law and that his contract is to be strictly construed (see, for example, State ex rel. North Dakota Workmen's Compensation Fund v. Padgett, 1926, 54 N.D. 211, 209 N.W. 388, 392) have usually been held not to apply to compensated surety companies. American Cas. Co. of Reading, Pa. v. Brezina Constr. Co., 8 Cir., 1961, 295 F.2d 603, 607, footnote 6; Massachusetts Bonding & Ins. Co. v. Feutz, 8 Cir., 1950, 182 F.2d 752, 756; 72 C.J.S. Principal and Surety § 102; 50 Am.Jur., Suretyship, §§ 32, 318.

■ 2. Although there is diversity of citizenship between Dakota and the surety here, this is not a diversity case. The amount in controversy is less than the statutory minimum prescribed by 28 U.S.C. § 1332(a). The action, instead, is instituted under § 2(b) of the Miller Act, 40 U.S.C. § 270b(b), which authorizes suit in federal court irrespective of the amount in controversy, and it is based on the payment bond required by § 1(a)

(2) of that Act. The situation therefore is not one where state law necessarily governs.[1] R. P. Farnsworth & Co. v. Electrical Supply Co., 5 Cir., 1940, 112 F.2d 150, 154, cert. den. 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454. Compare United States for Use of Carroll v. Beck, 6 Cir., 1945, 151 F.2d 964, 966, and First Camden Nat'l Bank & Trust Co. v. Aetna Cas. & Sur. Co., 3 Cir., 1942, 132 F.2d 114, 116, cert. den. 319 U.S. 749, 63 S.Ct 1157, 87 L.Ed. 1704.

■ 3. The Miller Act has for its purpose the protection of those who supply labor or materials for use in government construction. It is to be liberally construed. It is designed to give the supplier the same protection he would ordinarily receive under state lien laws. The bond protection it prescribes is in lieu of those liens. United States for Benefit and on Behalf of Sherman v. Carter, 1957, 353 U.S. 210, 216–217, 77 S.Ct. 793, 1 L.Ed.2d 776; Continental Cas. Co. v. United States for Use and Benefit of Robertson Lumber Co., 8 Cir., 1962, 305 F.2d 794, 797 (petition for certiorari pending); United States for Use and Benefit of Hopper Bros. Quarries v. Peerless Cas. Co., 8 Cir., 1958, 255 F.2d 137, 143, cert. den. 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69. It has even been said that the Act was not designed to protect general contractors. St. Paul-Mercury Indem. Co. v. United States for Use of Jones, 10 Cir., 1956, 238 F.2d 917, 921.

4. Where, as here, there are outstanding two or more matured and similar obligations of a debtor to one creditor and a payment by that debtor to the creditor, the question of proper application of that payment arises. This fact situation and its variations have provoked widespread litigation and have resulted in claimed conflict in the cases. It is perhaps not incorrect to say, however,

---

1. Nevertheless, we note, for what it may be worth, that § 22–03–06 of the North Dakota Century Code provides as follows:

"A surety is exonerated: * * *

"3. To the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights, or which lessens his security; * * *."

that the law today shapes up generally as follows:

(i) The payment is applied as the debtor intends and so manifests to the creditor before or at the time of the payment.

(ii) If the debtor fails so to indicate, the payment is applied as the creditor, within a reasonable time, determines.

(iii) If neither the debtor nor the creditor seasonably so indicates, the payment is applied as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied. This usually results in its application to the oldest unsecured account.

(iv) If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know of that duty. This is so despite the debtor's contrary direction.

This rule of freedom of application rests upon the concept that the money which the debtor is utilizing to make the payment is his own and is free for use as he pleases. The noted exception, phrased in terms of duty, rests on equitable considerations. Examples which the cases recognize without much conflict are where the surety itself makes a payment to the debtor or where money which comes to the creditor from the debtor is the same money for the payment of which the surety is bound and the creditor knows the source of that fund.

These rules [2] are outlined in detail, and with illustrations, in the Restatement of the Law of Contracts, §§ 387, 388 and 394, and are noted in such general compendia as 70 C.J.S. Payment §§ 50-80; 72 C.J.S. Principal and Surety § 144; and 40 Am.Jur., Payment, §§ 108-150, and in the notes at 21 A.L.R. 704 and 57 A.L.R.2d 855, and at 41 A.L.R. 1297, 130 A.L.R. 198 and 166 A.L.R. 641. Repre-sentative cases are cited in these works. We mention the following only as illustrative: Herrman v. Daffin, Mo.App.1957, 302 S.W.2d 313, 315-316; Maryland Cas. Co. v. City of South Norfolk, 4 Cir., 1932, 54 F.2d 1032, 1038, cert. den. 286 U.S. 562, 52 S.Ct. 644, 76 L.Ed. 1295; First Nat'l Bank of Mandan v. Larsson, 1937, 67 N.D. 243, 271 N.W. 289, 291; Depositors' Holding Co. v. Brown, 1933, 64 N.D. 222, 251 N.W. 295, 298; United States to Use of General Electric Distrib. Corp. v. Bell Constr. Co., 7 Cir., 1955, 226 F.2d 99. Much of the conflict in the cases revolves about the stated exception and in the determination whether under the facts there is a duty to apply a payment in a particular way. Compare, for example, the opposite approaches, taken with respect to the significance of knowledge on the part of the creditor of the source of payment and of an existing surety relationship, in Standard Oil Co. v. Day, 1924, 161 Minn. 281, 285-287, 201 N.W. 410, 412, 41 A.L.R. 1291, and in Ash Grove Line & Portland Cement Co. v. Moran Constr. Co., 1941, 139 Neb. 176, 296 N.W. 761, 762-763.

Dakota takes the position that these rules, as applied to the undisputed facts outlined above, compel a judgment in its favor. It emphasizes that Schroeder, as it made its payments to Dakota, specifically earmarked those payments for application to older obligations owing by it to Dakota and not to invoices issued with respect to the Bass contract, and that Dakota seasonably so applied those payments. It urges, too, that, although Dakota may have known of the payments by Bass to Schroeder, it did not know when those payments were made and, in any event, the funds which Dakota received were not funds which had originated with Bass. The surety's response is that Schroeder was under a duty to Bass and to it to devote the Bass payments to the discharge of the obligation for which the payment bond was given, that Dakota knew or had reason to know of that duty, and that Schroeder's designation of the

---

2. We note also, again for what it is worth, that these rules have been largely adopted by statute in North Dakota. North Dakota Century Code, § 9-12-07.

older obligations owing to Dakota was of no effect.

It is at this point where additional facts in the record, also largely undisputed, assume importance. These have to do with knowledge and *claimed control* of Schroeder by Dakota throughout the period of the Bass payments. The trial court deemed it unnecessary to make specific findings with respect to them. Those facts are the following:

(j) Dakota was organized in 1954. It purchased its inventory and business from Red River Industries, Inc., which theretofore had also been known as Dakota Electric Supply Company. In that transaction Red River received $225,000 redeemable non-voting stock of Dakota and loaned $100,000 to Dakota on an open note. A part of this loan was still outstanding in June 1959.

(k) Joseph D. Farnham was president of Red River and owned about 60% of its shares.

(l) By June 1959 Schroeder owed Dakota over $120,000.

(m) John M. Schroeder was Schroeder's president. He owned its outstanding 540 shares. Of those shares 520 were pledged to Red River to secure Schroeder's note. Mr. Schroeder was also personally indebted to Red River. Farnham had known Mr. Schroeder since 1951.

(n) In May 1959, Harold H. Berg, Dakota's credit manager, vice-president and treasurer, and Fred R. Orth, president of the First National Bank of Grand Forks, requested a meeting. This was held at Dakota's Fargo office on June 24, 1959. It was attended by Mr. Schroeder, Berg, Orth, Farnham, and Richard H. Barry, Dakota's chairman and president. Barry presided. The purpose of the meeting, as Berg testified, "was to make a determination as to how much materials might be ordered" by Schroeder, "where the account would possibly peak, and where it could be reduced to * * * we were trying to determine * * * could we handle it, and also to find out what Mr. Schroeder's plans were as to

how much further he was going to go * * *. One could probably say that one of the purposes of the meeting was upgrading the organization, but there was no thoughts as to changing the management * * * We felt that we should be kept closely informed of the over-all operation" of Schroeder. It appeared at the meeting that Dakota was the source of supply of 40 to 50% of Schroeder's materials and that what Dakota did "probably would influence other sources of supply". It was decided that a trust of the controlling interest in Schroeder should be established. A voting trust agreement was prepared and executed as of June 24. Farnham was named sole voting trustee. The trust res consisted of Mr. Schroeder's 520 pledged shares. Red River, as pledgee, was a party to the agreement. By it Farnham received the power to vote the trusteed shares and thus came into control of Schroeder. After discussion as to whether Orth or someone from Dakota should go on Schroeder's new board, Farnham elected himself, Mr. Schroeder (as the agreement specified), and, at the suggestion of Dakota's Berg, Maynard Helmeke, who was Dakota's auditor and who had also done auditing work for Schroeder. After the establishment of the voting trust Dakota extended additional credit to Schroeder.

(o) Farnham thereupon performed certain general management activities for Schroeder. He analyzed the company's statements and operations, went over accounts payable and receivable, made recommendations to management, discussed payrolls, reviewed pending jobs, correspondence and accounts, recommended bidding limitations, and was influential in management policies and procedures including the formation of an executive committee.

(p) Schroeder's office was at Grand Forks. From June 1959, when the voting trust was established, until April 1960, some of the meetings of Schroeder's board, however, were held in Fargo at Barry's office. Barry and Berg were present at a number of the board meetings.

There is evidence that at these meetings Barry participated in discussions of shipments by Dakota and that company's anticipated collections from Schroeder and of other matters, including the possibility of developing "an ownership situation" so that two of Schroeder's personnel could become shareholders with Mr. Schroeder. Berg also conferred about Schroeder's bookkeeping procedures and examined that company's statements and progress reports. Schroeder's $30,000 payment of March 1960 to Dakota was made at the suggestion and instance of Barry and Helmeke.

(q) There was an evident desire on the part of Dakota to be kept closely informed about Schroeder's operations. After June 1959 it was furnished with copies of Schroeder's statements, schedules of payables and receivables, and some reports and correspondence. There were meetings of Schroeder people with Dakota representatives. These concerned Schroeder's business operations and the status of Schroeder's jobs. Berg frequently stopped at the Schroeder office to see if there were funds available to make a payment to Dakota. He was aware that Schroeder was making its payments on old invoices and not on jobs currently in process. The payment of bills was discussed at the directors' meetings attended by Barry and Berg.

(r) Between the end of July 1959 and the end of January 1960 Schroeder's indebtedness to Dakota increased from $140,000 to $228,000.

(s) Farnham retired as a director of Schroeder in April 1960.

Dakota asserts that these additional facts disclose only the doings of a vigilant creditor acting honestly. The surety claims that these facts establish a complete defense to Dakota's present action; it cites four cases from four separate circuits as its primary authority for this position:

1. The first of these is the Miller Act case of R. P. Farnsworth & Co. v. Electrical Supply Co., supra, 5 Cir., 1940, 112 F.2d 150, cert. den. 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454, 130 A.L.R. 192. There the subcontractor had dealt with the supplier, Electrical, for years and owed it about $20,000. The subcontractor was financially shaky and later became insolvent. The jury could have found on the evidence that the supplier insisted on having everything the subcontractor received, net, from the general; that the supplier received permission to inspect the subcontractor's books and did inspect them; and that the supplier was aware that the funds received by it came from the job even though paid by personal check of the subcontractor's officer. The Fifth Circuit held that the direction of a verdict against the prime contractor was error. It said, p. 153 of 112 F.2d:

"We think the question of application of payments was wrongly decided. * * * There is no trust attaching to the monthly payments made to the contractor which prevents his using them generally as his own; but when he pays them over to a furnisher of materials for the job who knows their source, there is a duty to apply the money to the payment of those materials rather than to some other debt."

The surety stresses that here, as in Farnsworth, the subcontractor Schroeder had dealt with Dakota for many years; that it was substantially indebted to Dakota; that Dakota checked on Schroeder and inspected its books; that Schroeder was financially shaky and became insolvent; and that the funds received by Schroeder came from sources which Dakota knew included the progress payments made by Bass.

Dakota would explain Farnsworth on the ground that the equitable doctrine it expresses requires that the surety have a special interest in the identical fund used for the payment to the supplier. It asserts that in Farnsworth the very funds paid by the prime contractor to the subcontractor came over to the supplier and that the supplier knew of this despite the payment's being effected by personal check. It claims that, in

contrast, the facts here show that after each payment by Bass to Schroeder there were payments out from Schroeder's account to payees other than Dakota in amounts exceeding the Bass payments.

2. The second is the Miller Act case of United States for Use of Carroll v. Beck, supra, 6 Cir., 1945, 151 F.2d 964, 166 A.L.R. 637. There the supplier also loaned the subcontractor money for the latter's payrolls on the job and checks issued by the prime contractor to the subcontractor were indorsed by the latter and delivered to and cashed by the supplier under an agreement that they would be credited on the loan account. The Sixth Circuit affirmed a judgment for the prime contractor and its surety. It recognized the general rule that a debtor may usually apply the payments he receives as he sees fit and made reference to the Restatement expressions. It cited Farnsworth and applied it, saying, p. 966 of 151 F.2d:

> "The federal cases * * * generally deny the debtor's power to control application, insofar as the interests of others are affected, when the creditor knows where the money comes from. This is sometimes grounded upon abstract considerations of equity and justice, and sometimes upon an implied contractual obligation to the surety and his principal, in cases bearing similarity to this."

The surety here stresses that in Beck it was urged that the supplier, to be defeated in his suit, "must have known the source of the money" but that the court made it clear that direct knowledge of this was not a prerequisite for the surety's defense and that it was sufficient if the creditor had reason to know of the source of the funds. Dakota explains Beck, as it did Farnsworth, by pointing to the identity of the funds flowing from the prime contractor to the sub and on to the supplier.

3. The third is the Miller Act case of United States for Use of Crane Co. v. Johnson, Smathers & Rollins, 4 Cir., 1933, 67 F.2d 121. There the supplier sued for a balance claimed to be due for materials furnished to a post office project. The subcontractor received $4,000 from the general contractor and turned it over to the supplier. The latter applied it on an old schoolhouse account. Under instructions that if the jury found that the supplier knew that the funds came from the general contractor in respect to the post office job, the application to the schoolhouse account was wrongful, a verdict against the supplier on this $4,000 issue was rendered. The Fourth Circuit affirmed. After recognizing the general rule of free application and its lack of absoluteness where equitable considerations appear, the court said, pp. 123–124 of 67 F.2d:

> "Such an equity exists under the admitted facts of this case, in accordance with the rule announced by decisions in this and other federal circuits. We are in accord with these decisions in so far as they hold that when a surety is bound on one of several debts of the principal debtor to a creditor, and a payment is made by the debtor to the creditor with the identical money for the payment of which the surety is bound, or with the proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety, the application of the payment to some other debt, with or without the direction or consent of the debtor, does not bind the surety; at least if the source of the funds is known to the creditor or person receiving the payment. The surety in such case is entitled to have the payment applied to the debt for which he is bound. * * *

> "There are decisions to the contrary * * * which distinguish between cases where the money paid is the identical money for the payment of which the surety is bound, and cases where the payment is made merely from the proceeds of the contract, business, or transaction covered by the obligations of the surety. * * * These considerations are not

without weight, but, in our view, it places no burden or hardship upon a creditor who has knowledge of the source of the money to require him to apply the payment to the guaranteed debt * * *."

The surety here stresses the Johnson case's reference, not only to "identical money", but, as well, to the "fruits of the very contract, business or transaction". Dakota emphasizes that here again was money identifiably received by the subcontractor from the general.

4. The fourth is the non-Miller Act case of Columbia Digger Co. v. Sparks, 9 Cir., 1915, 227 F. 780. Here the supplier sued the surety on the contractor's bond for materials it had supplied to a city job. City funds for this job which came to the supplier were applied on the contractor's preexisting unsecured account with the supplier. The Ninth Circuit decided the case in favor of the surety and approved the following statement of the law:

"Where a surety has become responsible for the payment of money by the principal, and the latter receives money under his contract, which he pays over, the creditor or obligee has no right to apply such payments in any other way than to the relief of the surety."

One Judge dissented with the observation that the supplier was without notice of the source from which the money came. This, Dakota claims, is still another case of identifiable funds. Compare our own case of Cox v. New England Equitable Ins. Co., 8 Cir., 1917, 247 F. 955.

In summary, then, Dakota takes the position that these four cases represent an exception to the general rule of free application by the debtor, that the exception does not apply anyway unless the money paid by the subcontractor was the identical or identifiable fund received by it from the general contractor and arose out of the contract with respect to which the surety was bound; and that, because the money received by Schroeder from Bass was not traceable to the payments Schroeder made to Dakota, the four cases are not in point and actually support the judgment for Dakota.

We recognize the existence of certain features which weigh against the surety's position here: (a) Bass itself did not specifically direct the application of its progress payments to those Dakota invoices covering the materials supplied to the Bass job; (b) Bass could have obtained a measure of protection for itself and its surety by enforcing the provision in the subcontract calling for a performance bond from Schroeder; (c) Dakota did not know exactly when the Bass payments were received by Schroeder; and (d) the four cases primarily relied upon by the surety all present a degree of fund tracing.

■ Nevertheless, we are impressed by what we feel is the overriding equity of the situation before us in favor of the surety and we conclude that this brings this litigation within the orbit of the Miller Act cases of Farnsworth, Beck, and Johnson. We have in mind particularly the following:

1. Dakota, Schroeder, Mr. Schroeder, Farnham, and Red River were, in a very real sense, interrelated during the period from June 1959 to March 1960 when the supplies in question were furnished and when Schroeder reached a state of insolvency. Dakota, Schroeder, and Mr. Schroeder were all indebted to Red River. Red River was a shareholder, although a non-voting one, of Dakota. Red River was controlled by Farnham. Mr. Schroeder was also indebted to Farnham. Schroeder was deeply obligated to Dakota. By the voting trust agreement, Farnham, as sole voting trustee, came into control of Schroeder to a degree not theretofore existent under the pledge of Mr. Schroeder's shares of Schroeder to Red River.

2. Dakota, through its officers, Barry and Berg, and through Helmeke, its auditor, during this period came into close familiarity with the affairs of Schroeder. They knew its financial situation. They

knew the precariousness of that situation and its consistent worsening as the months passed. They knew or had access to knowledge that progress payments were being made to Schroeder by Bass on the dormitory job. They knew, inferentially at least, because of Dakota's experience with government projects, of the existence of a surety obligation on the Bass contract.

3. It was distinctly to Dakota's advantage to have every available dollar coming from Schroeder applied to its oldest obligation to Dakota.

Under these circumstances we believe that Dakota, if it did not have actual knowledge, at least had reason to believe, taking the realities of the situation seriously into consideration, that, despite the activity in the Schroeder bank account and, through the accidents of chronology, the consequent inability to trace a particular dollar from Bass through Schroeder to Dakota, the receipt of funds by Dakota was made possible to the proportionate extent by the progress payments by Bass. This, we think, is enough to bring this case within the equitable doctrine expressed in Farnsworth and its companion cases.

We are not content to dismiss or wave aside these interrelationships with the conclusion that Dakota's actions were no more than those of a vigilant major creditor performing honestly and participating only in informational meetings. We do not question or impugn the honesty of Dakota or that of any of the named individuals in any way whatsoever. What Dakota and its officers did constituted steps undoubtedly justified by past relations with Schroeder, by the subcontractor's financial involvement and by the extent of Schroeder's obligations to Dakota. But it does not follow from this that the steps taken by Dakota did not then result in a saving equity for this surety. We merely conclude that the closeness of the relationship of the named parties during the vital nine month period was such as to create an equity of the kind described in the general rules outlined above, and that that equity required the application of so much of the Bass progress payments received by Schroeder as was required for the materials supplied by Dakota to the Bass job.

We may state the matter another way by saying that we do not see how we can avoid the holdings and the implications of the Miller Act cases of Farnsworth, Beck, and Johnson. It is to be admitted, as we have noted, that in these cases the flow of funds from the general contractor through the subcontractor to the supplier was more readily identifiable than is the situation here. But the decisions in those cases, and their significance for Miller Act purposes, are broader than the ability to identify funds as they pass from the prime to the sub to the supplier. The Fourth Circuit in Johnson speaks with particularity of "The proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety" and does not restrict its observations to "identical money". That case broadly applies the necessary factor of creditor's knowledge of the source of funds to situations where the creditor ought to have known that source. And Farnsworth is impressive because of its reliance upon the factor of inspection of the subcontractor's books; that case seems to us to present a far less significant fact situation than does the present case where Dakota's involvement with the affairs of Schroeder is more evident and striking. In no Miller Act case of which we are aware have Farnsworth, Beck, and Johnson been disavowed. As we have said above, we conclude that we cannot avoid their impact here.

Finally, we are not convinced by Dakota's argument that because the contract price for the Schroeder portion of the Bass job was less than its final cost to Schroeder and because the difference between that cost and that price was greater than the price of the materials supplied to the job by Dakota and for which this action is brought, the surety sustained no detriment. The answer to this argument lies in the fact that the amounts paid by Schroeder to Dakota

during the period the Bass payments were being made far exceeded the cost of the supplies for the Bass job. The surety thus has sustained detriment in their non-application to the obligation for which it was bound.

The case is reversed and remanded for the entry of appropriate additional findings and for further proceedings consistent with this opinion.