**UNITED STATES of America**

v.

**TRANSAMERICA INSURANCE COMPANY.**

Civ. A. No. 178–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

May 10, 1973.

Raymond A. Carpenter, Asst. U. S. Atty., Richmond, Va., for plaintiff.

J. Clavitt Clarke, Jr., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

The United States, as plaintiff, brings this suit against the Transamerica Insurance Company for the sum of $43,-077.61, alleging that Transamerica, as

surety on a performance bond issued in favor of a corporation which is now a judgment debtor of the United States, is indebted to the United States in that sum. Jurisdiction is attained by virtue of 28 U.S.C. § 1345. The defendant has filed a counterclaim for declaratory judgment, to which the United States has made a motion to dismiss on the grounds that the United States is immune from such a claim in this Court. Both parties have further filed motions for partial summary judgment on the merits. From the record before it, the Court finds the following facts.

On September 24, 1962, Idlewild Pharmacy entered into a five year lease agreement with the United States, acting through the Federal Aviation Administration, for floor space at Dulles International Airport in which Idlewild intended to operate a news and drug concession. The lease provided for a minimum rent during the first year of the concession, 1963, of $70,000, to be prorated on a monthly basis. It further required Idlewild to secure a performance bond to guarantee the 1963 rent. Such a bond was issued by the American Surety Company of New York, which obligation was subsequently assumed by the Transamerica Corporation.

From the inception of its leasehold, Idlewild failed to pay the rent required under the terms of the lease. In 1963, the pharmacy paid rent of only $26,922.39, leaving unpaid the balance for that year of $43,077.61. It also failed to meet the rent obligations for subsequent years through 1967 and further incurred holdover rent liability for a period during 1968.

It appears from the record that in 1968 the United States either began, or anticipated the commencement of, attachment proceedings against Idlewild's property situated at Dulles Airport. In order to prevent attachment of its property, Idlewild entered into an agreement on March 11, 1968, with Aero Enter-

prises and the United States, by which Aero agreed to purchase the bulk of Idlewild's property for $35,000, $25,710 of which was to be placed into a special escrow fund and $9,290 of which was to be paid to Idlewild. According to the terms of the agreement, "[a]ny balance remaining in said fund at the end of said one year (satisfying certain claims that Aero might have) shall be held until final resolution of the suit by the Government against Idlewild; and it will be paid out according to the final result of said lawsuit." The agreement by its terms did not specify that the funds reserved should apply to any particular portion of the indebtedness. This agreement was fully consummated, and a sum of $25,710 was placed in escrow.

In addition to this escrow sum, Idlewild also sent to the United States the sum of $5,000 to be applied as a deposit toward a bid by Idlewild on a new lease of the same premises it had previously occupied at Dulles Airport. The record does not reflect the date on which this deposit was made, but apparently Idlewild's bid was not accepted by the United States. Benjamin Liegh, President of Idlewild, states that his company was entitled to the return of this deposit by the United States after the bid was rejected, which contention the United States has not refuted.

On January 5, 1970, judgment was entered in favor of the United States for lost rent from 1963 until 1968 in the sum of $340,574.96, plus interest. United States v. Idlewild Pharmacy, Inc., 308 F.Supp. 19 (E.D.Va.1969) (order entered subsequent to memorandum). This decision was affirmed by the Court of Appeals for the Fourth Circuit on April 8, 1971. No. 14,393 (4th Cir. 1971). The amount held in escrow apparently became available to the United States at this time, although the record does not reflect precisely when, in the course of litigation, the United States became entitled to the sum.[1]

1. The agreement states only that the money should "be held until final resolution of the suit by the Government against Idlewild; and it will be paid out according to the final result of said lawsuit." No definition of "final resolution" is provided.

On May 11, 1971, counsel for Idlewild Pharmacy, as its agent, directed the United States to apply the two payments which it had made to the government ($25,710 and $5,000) to that portion of the outstanding judgment which represented the unpaid balance of rent due for 1963. By letter dated May 18, 1971, the Land and Natural Resources Division of the Department of Justice informed Idlewild that the United States intended to apply the $30,710 against the 1968 holdover rental and interest and in partial satisfaction of the unpaid rent and interest for 1967. This had the effect of leaving Idlewild, and its surety for 1963, liable for the full amount due for 1963 of $43,077.61, plus interest. Subsequent to this letter, Transamerica tendered to the United States $12,367.61, representing the difference between the total owed for 1963 and the $30,710, as full payment of its obligation. The United States refused this tender and brought this suit to recover the full amount of $43,077.61. Transamerica remains prepared to turn over to the United States the sum of $12,367.61.

■■ As initial defenses, the defendants claim that the United States is barred from prosecuting this suit by the statute of limitations and laches. This contention is without merit. It is firmly established that the United States is exempt from statutes of limitation and laches except where Congress expressly provides otherwise. United States v. 93 Court Corp., 350 F.2d 386, 388 (2d Cir. 1965); Thompson v. United States, 312 F.2d 516 (10th Cir. 1962). On July 18, 1966, a general federal statute of limitations was enacted barring the United States from bringing an action for damages unless the complaint is filed within six years after the right of action accrues. 28 U.S.C. § 2415. Although this statute applies to actions such as this brought pursuant to 28 U.S.C. § 1345, it expressly provides that any cause of action in favor of the United States existing at the date of the Act's passage will be deemed to have accrued on that date. Therefore, even if the United States could have brought suit as early as December 31, 1963, to recover rent due for that year, the statute of limitations on this cause of action did not commence until July 18, 1966. Since the complaint was filed on April 12, 1972, the six year period had not terminated.

■ The defendant has filed a counterclaim for a declaratory judgment pursuant to 28 U.S.C. § 2201, in which it seeks a declaration that the sum of $30,710 paid over to the United States by Idlewild should be applied to the rent for 1963. Although this counterclaim is substantially identical to the defendant's major defense to the primary claim, the United States has moved to dismiss it on the grounds that it has not waived its sovereign immunity to suit. The United States would argue that its prosecution of this suit does not constitute a waiver of sovereign immunity and that there is no statute independently providing jurisdiction, and thus a waiver of sovereign immunity, in this Court for Transamerica's claim. The Court concludes, to the contrary, that the United States has waived its sovereign immunity as to Transamerica's claim by institution of this suit. The theory asserted by the Government might well have merit had Transamerica made a claim for affirmative relief against the United States for matters not arising from the same transaction as the plaintiff's claim. The nature of the defendant's counterclaim, however, is purely defensive in nature, being the equivalent of a claim of recoupment. It seeks no more than to defeat the government's claim and clearly arises out of the same transaction as the affirmative claim. Courts uniformly have held that the sovereign immunity of the United States from such defensive claims is waived upon the institution of the suit. E. g., Frederick v. United States, 386 F.2d 481 (5th Cir. 1967); In re Monongahela Rye Liquors, Inc., 141 F.2d 864 (3d Cir. 1944); see 3 Moore's Federal Practice, ¶ 13.02, n. 1 (1972). The Court is in full agreement with the reasoning applied in the *Frederick* case and holds that Transamerica may maintain its counterclaim. The mo-

tion to dismiss of the United States will be denied.

Turning to the merits of the controversy, the Court is initially confronted with the issue of which jurisdiction's law applies. Although the underlying lease was executed in Virginia, this is not a diversity case, such that Erie R. R. Co. v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), would require the application of the substantive law of Virginia. Because of the federal interest involved in securing uniform treatment of government leases, and because neither party alleges a particular reliance upon the law of Virginia in executing the agreements, federal law probably would apply. Thompson v. United States, 268 F.2d 426 (4th Cir. 1959); see Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); United States v. Taylor, 333 F.2d 633 (5th Cir. 1964); but see United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). It appears, however, that the principles of law which govern are the same in both jurisdictions.

The issue herein simply stated is whether the United States must apply the $30,710 which had been turned over to it by Idlewild to that portion of Idlewild's indebtedness to the United States which represents the unpaid rent for 1963, as directed by Idlewild's counsels' letter of May 11, 1971. The rule of law applied uniformly is that a debtor who makes a voluntary payment of his indebtedness has the power to direct to which portion of the indebtedness his payment is to be applied. United States for Use and Benefit of Crane Co. v. Johnson, Smathers & Rollins, 67 F.2d 121, 123 (4th Cir. 1933); see e. g., S. S. Silberblatt, Inc., v. United States for Use and Benefit of Lambert Corp., 353

F.2d 545 (5th Cir. 1965); St. Paul Fire and Marine Insurance Co. v. United States, 309 F.2d 22 (8th Cir. 1962). This freedom or right of application is based upon the concept that because the money which the debtor is utilizing to make the payment is his own, he is free to use it as he sees fit. See St. Paul Fire and Marine Insurance Co. v. United States, *supra*, 309 F.2d at 25; 60 Am. Jur.2d, Payment § 81. While the debtor generally must direct application of his payment at the time he makes it, the Court concludes that Idlewild, by virtue of its letter of May 11, supra, exercised this right in a timely fashion as to both payments. The direction encompassed in the communication was made approximately one month after the affirmance of the judgment against Idlewild. Even if the United States were entitled to the $25,510 escrow fund at the moment of that affirmance, which fact is by no means clear from the record, the Court deems a month's delay in this instance to be reasonable by reason of the complexity of the suit on which the judgment was based and the fact that the defendant may have considered petitioning the Supreme Court for a writ of certiorari. Moreover, there is no indication that the United States chose a particular application for the funds until after Idlewild's letter. As to the $5,000 deposit payment, the record indicates that Idlewild was entitled to the return of it after its bid on the new lease had been rejected. The letter of May 11, directing the United States to retain this sum and to apply it to the 1963 rental, should thus be considered the payment itself, since by it, Idlewild gave up the right to the return of the deposit, as such payment and application direction were made simultaneously.[2]

The United States argues, nevertheless that the $25,510 placed in the escrow

---

2. Had there not been a direction by Idlewild within a reasonable time, Transamerica might still prevail on an equitable trust theory if it could show that Idlewild was obligated by its surety agreement to apply any payments made to the 1963 rental and that the United States knew of this requirement at the time payment was made. See St. Paul Fire & Marine Insurance Company v. United States, 309 F.2d 22, 25 (8th Cir. 1962). The record is insufficient for the Court to rule on Transamerica's claim on the basis of this theory at the present time.

fund was not a voluntary payment by Idlewild of its indebtedness. Rather, it contends that this sum is the equivalent of proceeds of a judicial attachment and is thus not a voluntary payment. If so, then it would appear that Idlewild's direction of application is of no effect. O'Dell v. United States, 326 F.2d 451 (10th Cir. 1964); ALI, Restatement of Contracts § 393; 70 C.J.S. Payment § 51.

■ This Court concurs that the $25,710 fund in this case is the substantial equivalent of attachment proceedings and should thus be considered to have been made involuntarily. A close examination of the agreement among Idlewild, National News and Drug Corp. (apparently, a subsidiary of Idlewild), Aero Enterprises, and the United States reveals a sales contract executed for the sole purpose of avoiding attachment. Clauses (d) and (e) of the agreement are exemplary:

> (d) WHEREAS, Idlewild has certain stock, fixed improvements, and operating facilities on Dulles International Airport which the Government desires to attach as a setoff against such indebtedness; and

> (e) WHEREAS, the parties have agreed, in lieu of the attachment, to set up a special fund in the United States Treasury wherein 60% of the proceeds resulting from the sale of such stock, fixed improvements, and operating facilities of Idlewild's will be deposited and held pending settlement of the Government's claim against Idlewild; and 40% of such proceeds shall be paid over to Idlewild free of legal process.

The establishment of this fund was voluntary only in the sense that the United States agreed to protect its interests by a contract arrangement rather than through formal attachment proceedings. Moreover, the actual payment of the fund to the United States was automatically conditioned upon the result of litigation between the two parties, not upon any direction by Idlewild. The Court must conclude that, in any realistic sense, the property represented by the $25,710 sum was not Idlewild's "own" and that it was not free to do with it as it chose. This finding does not result, however, in a conclusion that the United States was left free to apply the sum as it chose. To the contrary, the Court concludes that neither party having the right to direct the application, the duty falls upon it to do so. Sec. 15 Williston on Contracts § 1797 (3rd ed. 1972). The Court further finds, however, that the record is insufficient at this state of the pleadings to enable it to so do.

■ In their memoranda, neither party discusses what standard must be applied by the Court upon a finding of an involuntary payment by Idlewild to the United States. A brief examination of authorities suggests that the Court must follow basic principles of equity, seeking to protect the rights and priorities of all the parties, 60 Am.Jur.2d, Payments §§ 89, 106, and that one of two alternative approaches may be in order. Some courts have held that where there is a large indebtedness and a lesser amount of money to pay the indebtedness, a court should apply payments in such a manner as to protect the creditor to the greatest extent possible. Thus, a creditor should be allowed to recover the full portion of a debt which is secured by a surety's promise and to apply other funds to unsecured portions of the debt. E. g., Gallatin Trust & Savings Bank v. Darrah, 153 Mont. 228, 456 P.2d 288 (1969); Ohio Electric Car Co. v. LeSage, 198 Cal. 705, 247 P. 190 (1926); Pope v. Transparent Ice Co., 91 Va. 79, 20 S.E. 940 (1895). Other courts, however, have held that involuntary payments are to be appropriated ratably to the entire debt. E. g., Bancroft v. Granite Savings Bank & Trust Company, 114 Vt. 336, 44 A.2d 542 (1945); see ALI, Restatement of the Law of Contracts § 393, Illus. 1. The approach to be taken in this case undoubtedly depends upon the equities involved and would turn on such matters, not presently known to the Court, as the degree to which the United States is secured on other portions of the total rental indebtedness. Summary judgment

must therefore be withheld on the $25,-710 fund.

■ As to the $5,000 deposit, however, the Court concludes that Transamerica is entitled to relief. The government argues that this money was tendered to the United States for a purpose unrelated to the 1963 rental. While this is undoubtedly true, it misses the point. As the Court has noted previously, the letter of May 11 should realistically be viewed as a payment of this $5,000 toward Idlewild's indebtedness. While an argument might be made that the retention of this $5,000 by the United States was the substantial equivalent of a garnishment of a debt owed to Idlewild, and should thus not be considered voluntary, the United States has not pursued this theory and the Court feels that any such characterization would be stilted. Idlewild was entitled to the $5,000 and it freely relinquished that entitlement in order to pay off its back debt. The Court holds therefore that this act was voluntary and declares that the sum of $5,000 should be applied to the 1963 rental, thus reducing by that amount the indebtedness of Transamerica to the United States.

An order in accordance with this memorandum will issue.