In re Earl H. SNEAD, Debtor.

GREY LINE AUTO PARTS,
INC., Complainant,

v.

Earl H. SNEAD and Muriel C.
Snead, Defendants.

Bankruptcy No. 79–00780.

United States Bankruptcy Court,
E. D. Virginia,
Richmond Division.

Nov. 20, 1979.

552

Daniel M. McCormack, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., for bankrupts/defendants.

E. Brodnax Haskins, Richmond, Va., for plaintiff.

MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

The Complainant, Grey Line Auto Parts, Inc. (Grey Line), filed herein on July 17, 1979 a complaint for relief from automatic stay of Bankruptcy Rule 13–401, in order to proceed in the state court to continue its suit against Earl H. Snead and Muriel C. Snead (Sneads) on an alleged promissory note (the Note) due from the Sneads to Grey Line. In the alternative, it has asked that the matter be heard here. Grey Line also seeks to recover attorney's fees in the collection of the Note. Grey Line further argues in its complaint that the Note signed by the Sneads is an individual obligation to pay Grey Line and not a corporate obligation, and that therefore, any judgments in favor of the Earl H. Snead, Inc. (the Corporation) against Grey Line are not assignable, and therefore, not allowable as an offset by the Sneads against claims by Grey Line. Grey Line also filed a proof of claim without stating the amount of the claim.

The Sneads on August 20, 1979 filed an answer to the complaint and an objection to Grey Line's proof of claim. They, by answer and brief, counter Grey Line's argument with the contention that an antitrust judgment was procured by Earl H. Snead, Inc. against Grey Line, that said judgment could be and was assigned to the Sneads individually and that said judgment can be used in an offset against Grey Line's claim against the Sneads. The Sneads also claim that Grey Line tortiously interfered with the Corporation's right to do business, resulting in monetary damage which is likewise assignable; that Grey Line is obligated by law to apply the credit from a return of inventory by the Corporation to the Note and then to the Corporation's open account; and since the offset from the antitrust judgment and the return of inventory is greater than the amount due on the Note, attorney's fees should not be allowed. In the alternative, the Sneads claim that they signed the Note only as guarantors of the Corporation's obligation and thus they were released from liability by the unexcused failure of Grey Line to continue to accept the return of auto parts which were security for the Corporation's Note guaranteed by the Sneads.

On August 28, 1979, pursuant to the request of the parties, this Court issued a pretrial order consolidating the complaint for relief from stay and the objection to the proof of claim for the purpose of determining the amount of the debt that may exist between the parties. On September 10, 1979, this Court heard evidence *ore tenus* and oral arguments of counsel. Upon consideration whereof and after hearing said evidence and argument of counsel and reviewing briefs filed in support of argument, the Court renders the following opinion.

## STATEMENT OF THE CASE

On or about January 1, 1977, the Corporation and Grey Line entered into a franchise contract under which the Corporation became a franchisee of Grey Line and operated an automobile parts store at 3062 Hull Street, Richmond, Virginia (the Store). The Franchise Contract consisted of four parts: (a) a franchise agreement which detailed the franchisor/franchisee relationship between Grey Line and the Corporation; (b) a $65,000.00 note (the Note) which was signed by Mr. and Mrs. Snead; (c) a security agreement which granted Grey Line a lien against the Corporation's inventory of parts to secure the Note; and (d) a lease by which Grey Line leased the Store to the Corporation. (Stipulation No. 4).

Mr. Snead is the sole stockholder of Earl H. Snead, Inc., (the Corporation) and in connection with the liquidation and dissolution of the Corporation is the assignee of assets of the Corporation, including any and all claims and judgments of the Corporation against Grey Line. (Stipulation No. 3).

The Corporation recovered a judgment against Grey Line in the United States District Court for the Eastern District of Virginia on June 6, 1978 in the principal amount of $30,000.00 plus interest, costs and attorney's fees and it recovered a second judgment against Grey Line in the United States District Court on January 11,

1979 in the principal amount of $5,684.43 for its costs and attorney's fees through the conclusion of the trial. As of June 1, 1979, the amount that Grey Line owed the Corporation on the judgments including principal and accrued interest was $38,221.65. (Stipulation No. 16).

Grey Line appealed the District Court judgments to the United States Court of Appeals for the Fourth Circuit and the judgments were affirmed *per curiam* by the Fourth Circuit in April of 1979. Thereafter Grey Line petitioned the United States Supreme Court for a writ of certiorari and that petition was pending as of the evidentiary hearing in this matter on September 10, 1979, and as of the filing of the memoranda of authorities by the parties. On October 1, 1979, the Supreme Court of the United States entered an order denying Grey Line's petition for writ of certiorari whereby Grey Line had challenged the June 6, 1978 and the January 11, 1979 judgments of the Corporation against Grey Line.

Meanwhile pursuant to an agreement in its Chapter XI proceedings[1] the Corporation, during the approximate period of March 1, 1979 to April 5, 1979, returned to Grey Line and Grey Line accepted without protest auto parts from inventory having a value of $53,991.91. Grey Line refused to accept the return of auto parts after April 5, 1979. Prior to the commencement of the return of the inventory, the Corporation in a letter by its counsel to Grey Line, specifically elected to have the value of the returned inventory credited first against the Note and then against its open account. Grey Line, however, applied the credit to the open account first and then to the Note.

As stipulated by the parties, the total obligation of the Corporation to Grey Line pursuant to the Note and open account is $82,972.78. (Stipulation No. 8).

On or about May 18, 1978, Grey Line opened a competing automobile parts store

---

1. The Corporation on May 17, 1978, filed a petition in this division under Chapter XI of the Bankruptcy Act (BK–78–00495–R). Subsequently, counsel for the parties agreed that all of the saleable inventory of auto parts would be returned by the Corporation to Grey Line. On February 16, 1979, this Court entered an order dissolving the automatic stay provided by Bankruptcy Rule 11–44 and permitted Grey Line to recover possession of its collateral.

at 3060 Hull Street, immediately adjacent to the store which was operated by the Corporation pursuant to the franchise contract with Grey Line. A sign was posted in the competing store at 3060 Hull Street which read simply "GREY LINE" and a banner was placed on the store which stated "THE MILLS ARE BACK" and "PRICES ARE RIGHT." For some years prior to the commencement of the Corporation's franchise operation at its store, Grey Line and Mr. William L. Mills had operated an automobile parts jobber store at the same location and Mr. William L. Mills knew many of the store's regular customers. Further Grey Line hired away the Corporation's store manager, who had worked in the store when Grey Line operated it, and its sales clerk to operate the competing store for Grey Line. Mr. Snead testified that he observed many instances in which William L. Mills would either call out to or physically intercept customers approaching the store operated by the Corporation and encourage those customers to purchase parts from the competing store. Mr. Snead also testified that on other occasions he observed instances in which the Corporation sold automobile parts to its customers only to have those customers leave the store and be intercepted by Mr. William L. Mills. Thereafter, the same customers would return the parts purchased from the store of the Corporation and go next door to purchase the same parts from the competing store operated by Grey Line. The total reduction in gross sales for the three months of May, June and July in 1978 as compared with the same months in 1977 is $56,139.15.

In an effort to enforce collection of the Note against Earl H. Snead and Muriel C. Snead, the attorney for Grey Line expended 24½ hours of attorney time in negotiations for return of merchandise and the institution of a suit in the Circuit Court of the City of Richmond (Division II) up to the time that action was stayed by filing of the Chapter XIII petition.

Counsel for both parties have agreed and the Court perceives the issues in this case to be:

(1) Did Grey Line have the right to credit the inventory returned by the Corporation first against the open account then against the Note despite the Corporation's election to have the returned inventory credited first against the Note and then the excess, if any, against the open account?

(2) Are Mr. and Mrs. Snead in their individual capacity allowed to set off assets of the Corporation, specifically an antitrust judgment and a tortious cause of action, against their individual debt to Grey Line?

(3) Did Grey Line tortiously interfere with the Corporation's right to do business, and if so, are the damages ascertainable by this Court?

(4) Finally, is Grey Line entitled to attorney's fees for its actions in attempting to collect on the Note from the Sneads?

## CONCLUSIONS OF LAW

■ The first issue is whether the Corporation had the right to direct that the value of the returned inventory be credited first against the Note and then its open account. It is well accepted that a debtor, such as the Corporation "at or before the time of making payments has the absolute right to direct to which of his debts payments shall be applied." 14B M.J., *Payment* § 24; *Accord, Northern Va. Sav. & Loan Ass'n v. J. B. Kendall Co.*, 205 Va. 136, 135 S.E.2d 178 (1964).

"The debtors primary and paramount right to direct how his payment shall be applied is binding on the creditor, even though the creditor does not consent to the designated application, and even though the debtor's direction violates the parties' previous agreement that the money could be otherwise applied. The reason is that until the payment is made, the money is the debtor's property, and he may require its application as he sees fit. The creditor has two choices: To apply the payment as directed, or return the money to the debtor. *If the creditor retains the payment, he is bound by the debtor's direction as to its application and the payment is regarded in law as having been applied as directed*—no matter how

the creditor in fact applies it—unless the improper application is subsequently ratified by the debtor. . . . A debtor's right to direct application of his payment is unaffected by his insolvency or his creditor's insolvency.

As a general rule, a debtor may direct application of his payment to any claim whatsoever as may be most advantageous to him. He may direct that his payment be applied on his entire mortgage indebtedness—both indorsed and unindorsed notes—and the creditor cannot apply it solely on the unindorsed notes. Or, he may avoid pro rata application of his payment to all his debts, and direct application of the entire payment to one debt, such as his most onerous obligation or a particular item on an open account." 60 Am.Jur.2d, *Payment* § 81 (Footnotes omitted.) (emphasis added). *Accord, United States v. Trans-America Ins. Co.,* 357 F.Supp. 743 (E.D.Va.1973).

The Corporation's election to have the value of the inventory credited first against the Note was precise and was communicated to Grey Line prior to the commencement of the return of the inventory. Grey Line had full knowledge of the election and proceeded to accept without protest the inventory returned to the Corporation for a period of approximately 30 days, during which time the Corporation returned inventory having a value of $53,991.91. Grey Line argues, however, that the Note was not one of the Corporation's debts, but an individual debt of the Sneads, and therefore, the Corporation could not direct that the credit from the returned inventory be applied to a debt of a separate entity. This argument is inconsistent with Stipulation No. 4 where the parties agreed that the "Corporation's inventory of parts [was] to secure the Note." But in any event, this was a voluntary return of the parts by the Corporation. The foregoing authorities, stating the general and well accepted principles applying to application of voluntary payments between debtor and creditor, clearly point to the conclusion, and the Court so finds that regardless of whether the Note was a separate and distinct obligation of the Sneads, or an obligation of the Corporation, Grey Line is required to comply with the instructions of the Corporation and to credit the value of the inventory first to the Note. After crediting the $53,991.91 value of returned inventory (Stipulation No. 19) against the $59,262.75 owing on the Note (Stipulation No. 17), the resulting principal balance due on the Note is $5,270.84 plus interest. (Stipulation No. 19).

■ The Sneads seek further to offset a tort claim for interference with the business of the Corporation litigated in this proceeding against Grey Line. Grey Line concedes that the Sneads are assignees of all claims of the Corporation; however, Grey Line contends that under Virginia law this particular tort claim is not assignable. Section 8.01–26 Code of Va.1950, as amended, provides: "[o]nly those causes of action for damage to real or personal property . . . are assignable." Grey Line contends that a tort of interference with business is not a property right, and therefore, not assignable. However, the United States Supreme Court has held the right to do business to be a valuable property right. *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, mod. on other grounds 171 U.S. 361, 18 S.Ct. 888, 43 L.Ed. 197 (1898); *See,* 45 Am.Jur.2d *Interference* § 51. Therefore, under the Virginia statute, *supra,* tort claims for interference with business are assignable; the Sneads are assignees of the Corporation's tort claim.

■ Grey Line also contends that § 68 of the Bankruptcy Act (11 U.S.C. § 108) prohibits assignment of this claim to effect a setoff in that the debts in issue are not mutual as required by subsection (a) of said section. The Court concludes, however, that the debts are mutual within the meaning of § 68(a) and therefore, may be set off against each other. The facts show that the Sneads are the assignees of the antitrust judgment and the tort claim of the Corporation (Stipulation No. 3); and therefore, they have the legal title to and the right to enforce the assignments in their own individual capacity. "The require-

ments that debts be mutual and entitled to set-off under § 68 (11 U.S.C.A. § 108) are met if the respective creditor shall own its claim in its own right . . . ." *In re Associated Telephone Utilities Co.*, 12 F.Supp. 468 (S.D.N.Y.1934). Grey Line seeks to enforce the Note against the Sneads individually, and the Sneads seek to set off the antitrust judgment and tort claim against the claim on the Note by Grey Line. Since the debts that the Sneads are seeking to set off are "between the same parties standing in the same capacity" they are mutual within the meaning of § 68(a). 4 *Collier on Bankruptcy*, 14th ed. § 68.04 at p. 867. *See, Blake v. Weiden*, 291 N.Y. 134, 51 N.E.2d 677 (1943).

■ Grey Line further contends that tort claims cannot be set off against claims arising from contracts. While there are some early cases supporting Grey Line's position, e. g. *Irving Trust Co. v. B. Altman & Co.*, 151 Misc. 504, 270 N.Y.S. 781 (1933), the trend is, and the weight of authority holds that such claims can and may be set off against each other:

> "Bearing in mind that set-off is favored in bankruptcy and that the purpose of § 68 is to permit a statement of account between the bankrupt and his creditors in order to arrive at a balance, the better view would seem to be that under § 68 tort claims may be set off against contract, or *vice versa.*" 4 *Collier on Bankruptcy*, 14th ed. § 68.04 at pg. 879 (Footnotes omitted, emphasis Collier's). *Accord, Milkman v. Bishop, McCormick and Bishop*, 259 App.Div. 723, 18 N.Y.S.2d 7 (1940); *In re Diplomat Electric, Inc.*, 361 F.Supp. 1163 (S.D.Fla.1973); *New York Credit Men's Adj. Bur v. Bruno-New York, Inc.*, 120 F.Supp. 495 (S.D.N.Y. 1954).

Therefore, since the claims of the Sneads are mutual with respect to Grey Line's claims, and tort claims may be set off against those of contract, § 68(a) affords the Sneads the right to offset the damages assigned to them by the Corporation against Grey Line's claim for monies due on the Note.

■ Grey Line further claims that § 68(b), which contains a prohibition against certain assignments, prohibits allowance of the setoff to the Sneads. However, 68(b) is clearly not applicable in this case. It provides that a setoff shall not be allowed in favor of "any debtor of the bankrupt which . . . (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing . . . ." The purpose of clause (2) "is to prevent debtors of the bankrupt from acquiring claims against him for use by way of setoff." 4 *Collier on Bankruptcy*, 14th ed. § 68.12, pg. 903–04. Such is not the situation in this instance as the Sneads are the bankrupts and not the debtors of the bankrupt. Accordingly, the Corporation's damages for tortious interference with business are available to the Sneads and are a proper offset against the claim of Grey Line. It is necessary, therefore, to turn to the allegation of tortious interference to determine whether the Corporation has proven its claim against Grey Line.

■ Even though it is somewhat doubtful if the elements that establish a *prima facie* tortious interference with a business relationship exist, the Court will make that assumption, but it is obligated to find that the claim must be denied because of the failure of the Sneads to sufficiently prove damages. The only evidence offered at the hearing on September 10, 1979 was that Mr. Snead in his operation of Grey Line Auto Parts franchise had a reduction of approximately $56,139.15 in gross sales over the period of May, June and July of 1978 when compared to his sales in May, June and July of the previous year. There was no evidence to differentiate between sales and profits; and net profit is the proper measure of damages, not gross sales. "Where a regular and established business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the Wrongful Act, with interest; it is the *net* loss and *not* diminution in *gross* income [sales]." 25 C.J.S. *Damages* § 90b. (Footnotes omitted-emphasis added). Therefore, since damages

 

have not been sufficiently proven, recovery for the tort of interference with business is denied.

The Sneads also seek to offset against Grey Line's claim in this action the judgment the Corporation received in the United States District Court for violation of the antitrust laws by Grey Line. Grey Line has not contested this other than by claiming that the judgment was not a mutual debt as addressed in this opinion, *supra.* Since judgments existing in favor of the Corporation are assignable to the assignee of the Corporation, and the debts are mutual as concluded, *supra,* the offset is available to the Sneads against Grey Line. 49 C.J.S. *Judgments* § 512. The Court finds an offset existing in the amount of $38,-221.65 as of June 1, 1979 with interest. (Stipulation No. 16).

The offsets against Grey Line available to the Sneads are such that they exceed the amount owed by the Sneads to Grey Line and for that reason the claim filed by Grey Line should be disallowed.

Grey Line further seeks attorney's fees for actions in attempting to collect on the Note. By signing the Note, Mr. and Mrs. Snead agreed to pay "all expenses incurred in collecting the same [Note] including reasonable attorney's fees and costs of court in case this note should not be paid at maturity or should all become due on default." From the above determinations, it is clear that the amount of the claims of the Sneads against Grey Line exceeds the amount of Snead's debt to Grey Line. In such circumstances attorney's fees are not to be allowed:

> "[W]here the defendant in an action on a note or similar evidence of indebtedness containing a provision for the payment of attorney's fees recovers on a counter-claim or the like in an amount in excess of the amount due on the note for principal and interest, the plaintiff is not entitled to recover such fees." 41 A.L.R.2d, Anno.: *Provision for Attorney's Fees* § 1[b] at p. 678. *Accord, Glen Alden Corp. v. Duvall*, 240 Md. 405, 215 A.2d 155 (1965); *Sugar v. Miller*, 6 Utah 2d 433,

315 P.2d 862 (1957); *Gilliland v. Rodriquez*, 77 Ariz. 163, 268 P.2d 334 (1959).

In the matter at hand, after crediting the return of inventory to satisfy the Note, the balance owing without taking into account the Corporation's antitrust judgment against Grey Line is $5,270.84. After also taking into account the assigned antitrust judgment and the offset resulting therefrom, the Sneads are not now indebted to Grey Line. Consequently no attorney's fees should be awarded.

An appropriate order will be entered.