WARREN BROTHERS COMPANY vs. SENTRY INSURANCE.

Norfolk. December 17, 1981. — April 21, 1982.

Present: GOODMAN, PERRETTA, & BROWN, JJ.

Contract, Building contract, Allocation of payment.

In the circumstances, it was proper for a subcontractor to appropriate money received from a food store chain, pursuant to a prior judgment on a complaint to reach and apply money owed by the chain to a contractor, for payment of the contractor's earlier and unsecured debts for labor and material furnished by the subcontractor at two of the chain's locations, despite a surety's claimed right to have the money applied against the contractor's debt arising out of work performed at a third location on which a labor and material payment bond had been furnished by the contractor. [433-440]

CIVIL ACTION commenced in the Superior Court Department on April 18, 1979.

The case was heard by *Hurd, J.*

*Elizabeth A. Ritvo* for the defendant.

*Peter F. Davis* for the plaintiff.

PERRETTA, J. The plaintiff subcontractor, Warren Brothers Company (Warren), brought an action against the defendant surety, Sentry Insurance (Sentry), to recover on a labor and material payment bond furnished by the principal contractor, The Healy Corporation (Healy), on its contract with The Great Atlantic & Pacific Tea Company, Inc. (the A & P), for work at the A & P's Quincy location.[1]

---

[1] The bond was A.I.A. Document A 311 (see American Institute of Architects Building Construction Legal Citator [1975]), and was given to protect labor and materialmen. See *Central Supply Co.* v. *United States Fid. & Guar. Co.,* 273 Mass. 139 (1930). See also *Superior Glass Co.* v. *First Bristol County Natl. Bank,* 380 Mass. 829, 831-832 (1980); G. L. c. 149, § 29A. Compare *Johnson-Foster Co.* v. *D'Amore Constr. Co.,* 314 Mass. 416 (1943) (performance bond); *Warren Bros. Co.* v. *Peerless*

Pursuant to a judgment on a complaint previously brought by Warren to reach and apply money owed to Healy, see G. L. c. 214, § 3(6), the A & P had paid over to Warren $20,000 due to Healy for Healy's work at the Quincy site. Rather than apply the money to Healy's debt for the work it had done at Quincy, Warren appropriated the money for payment of Healy's earlier and unsecured debts for labor and material provided by Warren at other locations and then commenced this suit to recover on the bond for the balance due from Healy. In this action, Sentry sought enforcement of a claimed right to have the payment received from the A & P applied against Healy's debt arising out of the A & P bonded, Quincy project. The judge found that Warren had made a proper application of the payment from the A & P, and he entered a judgment for Warren for the full amount owed by Healy on account of the bonded contract. Sentry appeals, and we affirm the judgment.

1. *The Facts.*

The circumstances of the present controversy are undisputed and relatively simple. In its complaint to reach and apply money owed to Healy, Warren identified three instances of its furnishing labor and materials to Healy for which it had never been paid. Those debts, in the order that they were incurred, were specified as: (1) a K Mart building site in Fairhaven, $10,000; (2) an A & P store in Brockton, $10,000; and (3) an A & P store in Quincy, $32,000.[2] The judgment in that earlier litigation rests on a stipulation by Warren, Healy, and the A & P acknowledging that Healy owed Warren $52,000 and that Healy was entitled to receive $20,000 from the A & P. The stipulation described that latter figure as being the amount left owing to Healy on the Quincy project after deductions were made

---

*Ins. Co.,* 8 Mass. App. Ct. 719 (1979) (statutory lien bond; G. L. c. 254, § 12). See generally 13 Couch, Insurance §§ 47:174, 47:179, 47:192 through 47:197 (2d ed. 1965).

[2] The East Bay Development Corp. was the owner and developer of the K Mart store, and it apparently defaulted in the proceedings on Warren's complaint to reach and apply.

for a Federal tax lien and for the establishment of a reserve fund for mechanics' liens.

By reason of the judgment against Healy and the A & P, the A & P forwarded $20,000 to Warren. Warren then wrote to Healy's attorney, informing him that it had applied the $20,000 against the balances due on the K Mart, Fairhaven, contract and the A & P, Brockton, project. These two debts were unsecured in that while bonds had been furnished, they were no longer available. Nine days later, Warren received a letter from Healy in which it was stated that "these funds were due on the A & P Quincy job and are to [be] applied to the balance due on the Quincy job."

At the conclusion of the instant trial, the judge found that when Warren, Healy, and the A & P entered into the previously described stipulation, no agreement had been reached between Healy and Warren concerning the manner in which the payment from the A & P was to be applied against Healy's total indebtedness. The judge specified that he "[did] not find that the parties intended that the $20,000 payment be applied to the Quincy project." None of the judge's findings of fact are challenged on appeal. In reliance on *Lampasona* v. *Capriotti*, 296 Mass. 34, 40-41 (1936), the judge concluded that the payment from the A & P should be applied to Healy's earlier unsecured debts rather than to the debt on the bonded Quincy contract, "under the circumstances in this case."

2. *Application of the Payment.*

It is an established rule that where there are several outstanding debts a debtor has the primary power to direct the application of a payment. If he fails to exercise this right before or at the time of the payment, the creditor is then free to appropriate the money to any of the debts, as he chooses and without concern for the debtor's interests. *Ramsay* v. *Warner*, 97 Mass. 8, 13 (1867). *Spinney* v. *Freeman*, 230 Mass. 356, 358 (1918). See 15 Williston, Contracts § 1796 (3d ed. 1972). When both parties fail to exercise their respective rights and the court is thereby required to direct application, it does so on the basis of all of

the circumstances of the transaction.[3]   Where the equities of the situation do not require a contrary result, the rule is that "the payments are applied by law to the liabilities of earliest date," *Crompton* v. *Pratt,* 105 Mass. 255, 257 (1870), even if "for some of these [debts] the creditor has a lien and has none for others," *Snell* v. *Rousseau,* 257 Mass. 559, 562 (1926).   See *Tudor Press, Inc.* v. *University Distrib. Co.,* 292 Mass. 339, 342 (1935); *Lampasona* v. *Capriotti,* 296 Mass. at 40-41.   See also Restatement (Second) of Contracts § 259, Comment a (1979).[4]

Before considering the relation of these principles to the present case, we dispose of an initial issue. A debtor and a creditor cannot affect the application of a payment enforced by judicial proceedings. *Blackstone Bank* v. *Hill,* 10 Pick. 129, 133 (1830). See *United States* v. *Transamerica Ins. Co.,* 357 F. Supp. 743, 747 (E.D. Va. 1973). See also 15 Williston, Contracts § 1797 (3d ed. 1972); Restatement of Contracts § 393 (1932);[5] Annot., 57 A.L.R. 2d 855, 869 (1958).   We do not see this rule, however, as here divesting either Healy or Warren of their ability to channel the payment made by the A & P pursuant to the judgment in the previous action. Warren was not a judgment creditor when it commenced its suit to reach and apply, and in its complaint Warren asked that the money due Healy from the A & P "be applied, as

---

[3] Sentry is asking, as a practical matter, that the court direct application of the payment even though Warren exercised its right to do so long ago. It is, however, the general rule that judicial application is made only when the parties have failed to designate the manner in which the payment is to be applied. *Cushman* v. *Snow,* 186 Mass. 169, 173 (1904). *Lampasona* v. *Capriotti,* 296 Mass. at 40.   See 15 Williston, Contracts § 1800 (3d ed. 1972); 13 Couch, Insurance §§ 47:73 and 47:75 (2d ed. 1965).   Because we conclude that Sentry has no equitable right to the benefit of the payment, we do not consider whether Sentry could and should have sought earlier enforcement of its claimed right.

[4] These rules do not necessarily apply to consumer debts which are generally regulated by statute. See, e.g., G. L. c. 255D, § 18, par. B.

[5] This section was not brought forward by the American Law Institute in its more recent consideration of application of payments. See Restatement (Second) of Contracts §§ 258 and 259, and Introductory Note to Topic 4, Application of Performances, at 297 (1979).

far as necessary, to pay the indebtedness of The Healy Cor-
poration, to the plaintiff." Neither the stipulation nor the
judgment in that action made provision for the manner in
which the payment was to be designated against Healy's
obligations.[6] See generally Reed, Equity Pleading and Prac-
tice §§ 473 through 475 (1952), for a discussion of the nature
and effect of a complaint to reach and apply.

We next consider whether in the instant action the judge
directed application of the payment "as justice between the
parties may require." *Cushman* v. *Snow*, 186 Mass. 169, 173
(1904). *Snell* v. *Rousseau*, 257 Mass. at 561-562. The judge
found that "under the circumstances," the payment should
be applied to Healy's earlier, unsecured debts. While he
did not elaborate upon these circumstances, his conclusion
is amply supported by the record before us.

As between Warren and Healy, Warren acted reasonably
and well within its rights in applying the payment to
Healy's earlier, unsecured debts. The only question in this
respect is whether Healy's subsequent command — "these
funds were due on the A & P Quincy job and are to [be] ap-
plied to the balance due on the Quincy job" — was of any
legal consequence. The record before us establishes that
Healy was an active participant in the prior litigation, that
it knew that the A & P was going to turn over the $20,000
due it to Warren, and that it had ample opportunity to
direct application of the payment before Warren appropri-
ated it to the earlier, unsecured debts. "The debtor has no
power to direct the application after the payment has been
made [footnote omitted], because having once made pay-
ment unconditionally he cannot thereafter revoke his act
and make it conditional." 15 Williston, Contracts § 1796
(3d ed. 1972). See *Backhouse* v. *Patton*, 30 U.S. (5 Pet.) 160,
170 (1831); *Page* v. *Patton*, 30 U.S. (5 Pet.) 304, 310 (1831).

---

[6] There is nothing in the record to indicate that the A & P took a posi-
tion or an interest in the application of the payment. We therefore pro-
ceed on the assumption, which is more favorable to Sentry than to War-
ren, that at the time of the payment, Healy had a say in the matter of how
the payment should be designated.

See also Restatement of Contracts § 392 (1932) ("An application of a payment once rightfully made by one party, cannot thereafter be changed without the manifested assent of the other"); Restatement (Second) of Contracts § 258(1) (1979) ("[A] performance is applied according to a direction made by the obligor to the obligee at or before the time of performance"), and Comment b (1979) ("An obligor's direction may be made before as well as at the time of performance, but it is the time of performance that is controlling, and a direction made earlier can be changed or revoked"). It is also provided in Comment b that "[i]n extreme situations a particular application may be so disadvantageous to the obligor that it is not permitted to the obligee even absent a contrary direction by the obligor. See § 259(2)." This is not an "extreme situation." Healy's desired application is just as disadvantageous to Warren as Warren's actual application is to Healy. Section 259(2) contemplates a far more aggravated consequence to the obligor before the obligee can be precluded from making an application most beneficial to him.[7] We conclude that because Healy could have restricted application of the payment from the A & P before Warren designated the manner in which it was to be applied, Healy's direction came too late to have any effect on Warren's rights. There is nothing in the circumstances of the transaction, as they relate to Healy and Warren, which requires that the payment be credited against Healy's later, secured debt.

Sentry claims that the above discussed rules have little, if any, relevance where the debt in issue involves a surety. It argues that because the source of the funds for the payment was the bonded contract and that because Warren knew the

---

[7] Restatement (Second) of Contracts § 259(2) (1979), provides:

"(2) A creditor cannot apply such a payment to a debt if

(a) the debtor could not have directed its application to that debt, or

(b) a forfeiture would result from a failure to apply it to another debt and the creditor knows or has reason to know this, or

(c) the debt is disputed or is unenforceable on grounds of public policy."

source of the funds when it received and applied them, the surety has an equitable right to have the payment applied against the debt on the bonded contract. This assertion by Sentry is known as the "identical source" or "identical property" exception to the rule that although a surety is liable for one of several debts this does not affect the rights of the debtor or creditor to control the application of a payment. See *United States* v. *Johnson, Smathers & Rollins,* 67 F.2d 121, 123-124 (4th Cir. 1933); *St. Paul Fire & Marine Ins. Co.* v. *United States,* 309 F.2d 22 (8th Cir. 1962), cert. denied, 372 U.S. 936 (1963). See also 15 Williston, Contracts § 1795A (3d ed. 1972); 13 Couch, Insurance § 47:74 (2d ed. 1965); Simpson, Suretyship § 44 (1950). But see *Standard Oil Co.* v. *Day,* 161 Minn. 281 (1924). But see also 13 Couch, Insurance §§ 47:75 through 47:78 (2d ed. 1965); Restatement of Security § 142(d) (1941); Note, Application of Payments: Surety's Right or Risk, 23 Chi.-Kent L. Rev. 76 (1944).

The authorities recognizing the exception to the rule have done so, generally, on "the theory that such moneys are impressed with an equity in favor of the surety that entitles it to have the money applied in payment of liabilities incurred by the contractor under the contract." *Standard Oil Co.* v. *Day,* 161 Minn. at 286. To the extent that the "identical source" exception embraces an absolute right in the surety to receive the benefit of a payment which the creditor knows to have issued from the proceeds of the bonded contract, we do not think it fair or sound.

"[The identical source rule] leads to an instability in commercial business that' does not have our approval. The creditor should not, in the collection of his money, be burdened with the responsibility of having to know the status of his debtor's accounts nor the status of the obligation of the surety of the debtor.

"The surety in modern business should be, and usually is, quite able to care for itself. It selects those for whom it becomes surety. Most contractors and subcontractors must necessarily use some of their money

that they receive in payment of obligations not in-curred in the particular contract from which their money is received. When they receive their money un-conditionally, it is their own and they may do with it as they please. If a creditor must stop, before he accepts payments from his debtor, and make the impertinent inquiry as to his standing with his surety, the unsatis-factory results are obvious. Such a position not only gives undue regard to the surety, but is in utter disregard of the right to make private contracts and the obligation thereof. Suppose his tailor is delivering a suit of clothes which he has made for the subcontrac-tor, and the latter tenders payment in funds which the tailor knows came from the work covered by a surety bond, must the tailor refuse it, or take it clothed with an equity that, perchance, later permits the surety to take it away from him? A surety is not entitled to such judicial mercies. The tailor has business perils of his own. The business of sureties is inherently one of con-stant peril and their imperative watchfulness for their general protection makes it less burdensome for them to guard against the emergency here under considera-tion and our view tends more to the stability of ordi-nary business." *Id.* at 287.

We think it more equitable to view any interest that the surety may have in the application of the funds as simply another factor to be weighed by the court in making its determination.

In assessing Sentry's claim of entitlement to the benefit of the payment, we especially note that there is nothing in the contract between Healy and Warren which obligated War-ren to credit the Quincy project for any payments received from the proceeds of that contract. See, e.g., *McCarty* v. *Sauer*, 64 Idaho 748, 754 (1943). Nor does the contract be-tween Healy and Sentry require Healy to direct application of any payment received from the A & P on account of the

Quincy contract to unpaid bills for labor and material provided on that project. See Restatement of Security § 142(d) (1941) ("[W]here a principal makes a payment to a creditor with funds arising out of a contract for which the surety is bound, the rules as to the application of payments are not affected by the fact that the creditor is aware of the source of these funds, unless the principal has contracted with the surety as to the application of such funds and this fact is known to the creditor"). Had Sentry's bond obligated Healy to direct the payment in the manner Sentry now seeks to enforce, Warren's right, if any, to apply the payment otherwise would be highly questionable. See Restatement (Second) of Contracts § 258(2) (1979) ("If the obligor is under a duty to a third person to devote a performance to the discharge of a particular duty that the obligor owes to the obligee and the obligee knows or has reason to know this, the obligor's performance is applied to that duty"). Sentry played no role in obtaining the funds by which the payment in dispute was made. See Simpson, Suretyship § 44; Restatement of Security § 142(c) (1941). Sentry does not suggest, nor could it on this record, that Warren and Healy "colluded" on the application of the payment or "committed a fraud on the surety."[8] See Note, 23 Chi.-Kent L. Rev. at 78. Cf. *Richardson* v. *Washington Bank,* 3 Met. 536, 541 (1842). While Warren had knowledge of the source of the funds, Sentry does not contend and the evidence does not show that Healy and Warren had a "close relationship" or an "interrelationship" which allowed either to control or to influence the other. See *St. Paul Fire & Marine Ins. Co.* v. *United States,* 309 F.2d at 30.

While we do not say that under no set of facts can a surety have a recognized interest in the application of a payment which derived from the proceeds of a bonded contract, we conclude that in light of all the circumstances of this trans-

---

[8] Moreover, the possibility of collusion here seems remote. The testimony of Bernard Healy, a principal officer of Healy, and the remarks of Warren's counsel during oral argument before us indicate that Sentry has an indemnification agreement with Bernard Healy as well as with Healy.

action, any interest claimed by Sentry was not superior to Warren's right to apply the payment as it saw fit.

3. *Conclusion.*

Warren acted appropriately and within its rights in its dealings with Healy. Sentry's economic self-interest was no greater than Warren's, and the judge's conclusion that the payment should be directed against Healy's earlier, unsecured debts was reasonable.

*Judgment affirmed.*