538 A.2d 562

**UHL CONSTRUCTION, a Pennsylvania Corporation, and Transamerica Insurance Company, a California Corporation, Appellant,**

**v.**

**FIDELITY & DEPOSIT COMPANY OF MARYLAND, a Maryland Corporation, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 18, 1987.

Filed Feb. 22, 1988.

Russell C. Miller, Allison Park, for appellant.

Daniel J. Weis, Pittsburgh, for appellee.

Before MONTEMURO, POPOVICH and HESTER, JJ.

MONTEMURO, Judge:

This appeal concerns a judgment entered by the Court of Common Pleas of Allegheny County holding Fidelity & Deposit Company of Maryland ("Fidelity") liable to Uhl Construction Company, Inc. ("Uhl") and Transamerica Insurance Company ("Transamerica") in the amount of $13,-490.00. The events leading to this appeal began when the

owners of the Reformed Presbyterian Home in Pittsburgh, Pennsylvania,[1] contracted with Uhl for structural restoration of the Reformed Presbyterian Home. Uhl acquired a labor and material payment bond from Transamerica. This bond named Uhl as principal and the owners of the Home as the obligee. By the specific terms of the bond, Transamerica, as surety, accepted joint and several liability with Uhl for the payment of both labor and material costs reasonably incurred by Uhl or any of Uhl's subcontractors in the completion of the restoration of the Home.

Uhl awarded a subcontract for the interior finishing work of the Home to Precision Building Systems, Inc. ("Precision"). Precision acquired a labor and material bond from Fidelity.[2] This bond named Precision as the principal and Uhl as the obligee. By the terms of this bond, Fidelity became the surety for payment of the labor and material costs incurred by Precision in the performance of its subcontract with Uhl for interior construction of the Home. During the course of its performance of the subcontract, Precision bought construction materials from Pittsburgh Builders Supply Company ("Pittsburgh"). The record before us contains copies of approximately forty-two sales invoices, dated between August and December of 1982, identifying with particularity the construction materials furnished by Pittsburgh to Precision for use in the Reformed

1. The owners of the Reformed Presbyterian Home are designated in the record before us as the Reformed Presbyterian Woman's Association and the Union National Bank of Pittsburgh.

2. In addition to the labor and material bond, Fidelity had provided Precision with a subcontract performance bond covering the Presbyterian Home job. "A performance bond guarantees that the contractor will perform the contract, and usually provides that if the contractor defaults and fails to complete the contract, the surety can itself complete the contract or pay damages up to the limit of the bond. A labor and material bond guarantees the owner that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults." 17 Am.Jur.2d, *Contractors' Bonds* § 1. The trial court determined that Fidelity was liable to Uhl under the terms of the subcontract performance bond in the amount of $13,490.00. This determination by the trial court has not been challenged on appeal.

Presbyterian Home job.[3] Precision performed some of the interior finishing work on the Home but was unable to complete its subcontract with Uhl. As a result of Precision's default, Uhl undertook the completion of Precision's subcontract.

On March 22, 1983, Pittsburgh filed a complaint against Uhl and Transamerica, seeking $42,000.00 for construction materials supplied by Pittsburgh to Precision for the Presbyterian Home job. Pittsburgh's cause of action was based upon the labor and material payment bond which Transamerica had issued to Uhl. Uhl and Transamerica brought Precision and Fidelity into the lawsuit as additional defendants. Thereafter, Uhl paid the $42,000.00 claim to Pittsburgh and received an assignment of Pittsburgh's claim. Trial Ct. Order, 10/3/84. On December 18, 1985, a non-jury verdict was entered by the Allegheny Court of Common Pleas, holding Fidelity liable to Uhl and Transamerica in the amount of $55,490.00.[4] Fidelity filed a motion for post-trial relief, challenging its obligation to pay the $42,000.00 in construction material cost. Fidelity contended that the labor and material bond was ineffective due to lack of delivery and, in the alternative, that Pittsburgh had been fully paid by Precision for materials used in the Presbyterian Home job but had "misapplied the funds received from Precision Builders to other jobs rather than the job involved in this case to the prejudice of a surety." Appellee's Motion for Post–Trial Relief, 1/3/86.

On June 23, 1986, the trial court entered an amended non-jury verdict reducing Fidelity's liability to $13,490.00. In its memorandum opinion, the court concluded that Fidelity's labor and material bond was effective.[5] Further, it was

3. Each sales invoice prepared by Pittsburgh identifies Precision as the buyer of the construction materials and identifies the "Presbyterian Home, Perrysville" as the place for shipment.

4. This amount consisted of the $13,490.00 awarded under Fidelity's subcontract performance bond and $42,000.00 awarded under Fidelity's labor and material bond.

5. Fidelity had claimed in the trial court that it had never delivered the labor and material bond to Precision to cover the Reformed Presby-

apparent that during the period of time in which Precision was working on the Presbyterian Home job, Precision made payments to Pittsburgh from the subcontract proceeds Precision received from Uhl. These payments from the Uhl subcontract proceeds completely covered the cost of materials which Precision had purchased and used in the Presbyterian Home job. However, Precision had a running account with Pittsburgh and owed Pittsburgh for materials which it had purchased and used in jobs it had undertaken prior to the Presbyterian Home job. As a result, when Pittsburgh received a payment from Precision, it applied the payment to the oldest outstanding debt in Precision's running account. It is undisputed that when Precision made payments from the subcontract proceeds it received from Uhl, Precision did not direct Pittsburgh to apply such payments to the debt from the Presbyterian Home job. Op. of Trial Court at 4. Thus, the $40,000.00 debt for materials supplied to Precision for the Presbyterian Home job remaining in Precision's account can be attributed to the manner in which Pittsburgh applied Precision's payments.

The trial court found that "Pittsburgh knew that the funds paid to it by Precision had been furnished by Uhl for labor and materials supplied by Pittsburgh for the Reformed project." Op. of Trial Court at 3. Our thorough review of the briefs and record in the instant case reveals that it is uncontested that Pittsburgh knew that the source of Precision's payments was the proceeds of a bonded construction job. As a result of Pittsburgh's admitted knowledge, the trial court concluded that Pittsburgh had a duty to apply these payments to the debt arising from the Presbyterian Home job. Op. of Trial Court at 4. Therefore, the trial court concluded that Fidelity had no obligation to reimburse Uhl and Transamerica for the $42,-

terian Home job. As a result of the absence of a delivery of the bond, Fidelity had claimed the labor and material bond was not valid and binding upon Fidelity. The trial court rejected Fidelity's contention, concluding that the bond was effective because it had been delivered to an agent of Precision. Op. of Trial Court at 3. The appellant has not challenged this conclusion by the trial court on appeal and, therefore, we need not consider it.

000.00 paid to Pittsburgh for construction materials. Uhl and Transamerica thereafter filed an appeal with this Court.

The issue that we must decide in this case can be expressed as follows:

Is the supplier of materials to a contractor in a bonded construction project under a duty to apply the contractor's payments to the debt relating to the bonded project, when the supplier knows that the contractor's payments are being made from the funds of the bonded project?

■ This specific issue is an issue of first impression in this jurisdiction. We find the trial court erred in concluding that the case of *Toll–Barkan Co. v. Toll,* 193 Pa.Super. 221, 164 A.2d 36 (1960) required the result reached by the trial court in the instant case. In *Toll,* a housing developer and a contractor had agreed on a bonus payment to the contractor in the event that a certain group of homes was completed within a one year period. During the construction process, the contractor received a series of progress payments from the developer. The developer did not designate how these payments were to be applied by the contractor, and the contractor applied them toward payment of the bonus. The contractor completed the group of homes within the one year period and then submitted a bill for $9000.00 which remained due on the construction of several of the homes. The developer contended that there had been no agreement for the payment of a bonus and that the contractor, as a creditor, did not have a right to apply progress payments to a disputed or contested debt. *See Page v. Wilson,* 150 Pa.Super. 427, 28 A.2d 706 (1942). The *Toll* court found that the contractor was within his rights as a creditor in applying the progress payments to the bonus payment due to him, reasoning that "after the trial judge found the bonus claim to be valid, the appropriation of the $10,000.00 to it was proper whether made by the court or as having been made previously by the claimant." *Toll, supra* 193 Pa.Super. at 226, 164 A.2d at 39. The court quoted the following as the controlling law guiding its decision:

> The debtor has a right to make the application, in the first instance, and failing to exercise it, the same right devolves on the creditor. *When no application is made by either party,* the law determines how the payments are to be applied in accordance with equitable rules and principles, and primarily, it deems the payments to be made in discharge of the earliest liabilities of a running account—each item of credit is applied in extinguishment of the earliest debit items in the account; in other cases, it will apply payment, *when not appropriated by either party,* in the way most beneficial to the creditor, that is, to the debt least secured, unless to the prejudice of a surety.

*Id.,* 193 Pa.Superior Ct. at 225, 164 A.2d at 38 (quoting *Page v. Wilson,* 150 Pa.Super. 427, 433, 28 A.2d 706, 709 (1942)) (emphasis added). Thus, it is a general rule in Pennsylvania law that where a debtor owes more than one debt to a creditor, the debtor has the first right to specify the particular debt to which a payment is to be applied. If the debtor does not exercise this right, the creditor may apply the money to one or more of the debts in any manner in which he chooses. If neither the debtor or the creditor has made an application of the payment, then the law will make an application. *See Bolgen v. Progressive Composition Co.,* 430 Pa. 140, 242 A.2d 269 (1968); *In re Woods' Estate,* 350 Pa. 290, 38 A.2d 28 (1944); *Pardee v. Markle,* 111 Pa. 548, 5 A. 36 (1886); *Page v. Wilson, supra.*

■ In the case before us, we must determine whether Pittsburgh's right as a creditor of Precision to make an application of Precision's payments is an unqualified right. The only limit imposed by our courts upon a creditor's right of application was defined in *Page v. Wilson, supra,* where the court stated that a creditor may not apply payments to a disputed or contested debt and thus prevent a debtor from litigating the validity of the debt. *Id.* 150 Pa.Super. at 435, 28 A.2d at 710. *See also Toll–Barkan Co. v. Toll, supra* 193 Pa.Super. at 226, 164 A.2d at 39. The instant case does not involve a disputed or contested debt.

Other jurisdictions have addressed issues similar to the one we now face and have reached conflicting results. One line of decisions has held that a supplier's right to make an application of payments is limited where the supplier "receives payment from the contractor with knowledge of the fact that the money comes from the particular construction job with respect to which the surety is liable ..." *Couch on Insurance 2d* (Rev ed) § 47:74. Thus, it has been held that if a supplier knows that money paid to him is from a particular bonded job, the supplier is under a legal duty to apply that money to the debt stemming from the bonded job, thus providing a protection for the surety. This limitation on a supplier's right to determine the application of his debtor's payments on a running account is "sometimes grounded upon abstract considerations of equity and justice, and sometimes upon an implied contractual obligation to the surety and his principal." *American Oil Company v. Brown Paving Company*, 298 F.Supp. 528, 535 (D.C.S.C. 1969) (citations omitted). *See U.S. For West Chester Electric Co. v. Sentry Insurance*, 774 F.2d 80 (4th Cir.1985); *St. Paul Fire and Marine Insurance Co. v. United States*, 309 F.2d 22 (8th Cir.1962); *United States Casualty Co. v. Noland*, 286 F.Supp. 333 (M.D.N.C.1968); *School District of Springfield v. Transamerica Insurance Co.*, 633 S.W.2d 238 (Mo.App.1982); *Bain–Nicodemus Inc. v. Bethay*, 40 Tenn.App. 487, 292 S.W.2d 234 (1954). *See also* 57 A.L.R.2d 855; 17 Am.Jur.2d *Contractors' Bonds* § 110.

While we need not say that we would never find a limitation upon a supplier's right to make an application of payments because of a superior interest of a surety, under the facts of the present case, Pittsburgh was within its rights in applying Precision's payments to debts unrelated to this bonded construction job. We are persuaded by the decision of the Appeals Court of Massachusetts in *Warren Brothers Co. v. Sentry Insurance*, 13 Mass.App. 431, 433 N.E.2d 1253 (1982). In *Warren*, as in the instant case, a supplier received payments from a contractor and applied these payments to earlier, unsecured debts of the contractor even though the supplier knew that the payments were

derived from the proceeds of a bonded contract. The Massachusetts court stated that "an absolute right in the surety to receive the benefit of a payment which the creditor knows to have issued from the proceeds of the bonded contract, we do not think ... fair or sound." *Id.* at 437, 433 N.E.2d at 1257. The *Warren* court cited the following language from *Standard Oil Co. v. Day,* 161 Minn. 281, 201 N.W. 410 (1924):

> [The identical source rule] leads to an instability in commercial business that does not have our approval. The creditor should not, in the collection of his money, be burdened with the responsibility of having to know the status of his debtor's accounts nor the status of the obligation of the surety of the debtor.
>
> The surety in modern business should be, and usually is, quite able to care for itself. It selects those for whom it becomes surety. Most contractors and subcontractors must necessarily use some of their money that they receive in payment of obligations not incurred in the particular contract from which their money is received. When they receive money unconditionally, it is their own and they may do with it as they please. If a creditor must stop, before he accepts payments from his debtor, and make the impertinent inquiry as to his standing with his surety, the unsatisfactory results are obvious. Such a position not only gives undue regard to the surety, but is in utter disregard of the right to make private contracts and the obligation thereof. Suppose his tailor is delivering a suit of clothes which he has made for the subcontractor, and the latter tenders payment in funds which the tailor knows came from the work covered by a surety bond, must the tailor refuse it, or take it clothed with an equity that, perchance, later permits the surety to take it away from him? A surety is not entitled to such judicial mercies. The tailor has business perils of his own. The business of sureties is inherently one of constant peril and their imperative watchfulness for their general protection makes it less burdensome for them to guard

against the emergency here under consideration and our view tends more to the stability of ordinary business. *Warren, supra* at 437–438, 433 N.E.2d at 1257–1258 (citation omitted).

We believe that the public interest is best served by the free flow of commercial transactions. "Money released into trade should be permitted to circulate freely, unburdened by hidden equities or liens." *Templeton v. Sam Klain & Son, Inc.,* 400 N.E.2d 1198, 1202 (Ind.App.1980) (quoting *Salt Lake City v. O'Connor,* 68 Utah 233, 242, 249 P. 810, 814 (1926)). A surety, such as Fidelity in the instant case, has the necessary expertise and experience to protect itself. The surety is also in the best position to protect itself from the risk of loss which is inherent in the surety business. The position of the surety is in stark contrast to that of the material suppliers who cannot, consistent with reasonable business practice, constantly question their clients concerning the specific sources of the money used to pay them or the conditions which may exist upon their client's free use of construction contract proceeds. It is not the responsibility of suppliers to oversee the finances of their client contractors. We note that Fidelity's labor and material bond did not obligate Precision to direct application of any payments received from Uhl to unpaid bills for labor and material incurred in connection with the Presbyterian Home job.[6] This is the case even though Fidelity must have

---

**6.** Had Fidelity's bond obligated Precision to direct payments in the manner Fidelity now seeks to enforce and Pittsburgh had been aware of this contractual duty on the part of Precision, Pittsburgh's right to apply the payments otherwise would be doubtful. *See* Restatement (Second) of Contracts § 258(2) ("If the obligor is under a duty to a third person to devote a performance to the discharge of a particular duty that the obligor owes to the obligee and the obligee knows or has reason to know this, the obligor's performance is applied to that duty"); Restatement of Security § 142(d) ("[W]here a principal makes a payment to a creditor with funds arising out of a contract for which the surety is bound, the rules as to the application of payments are not affected by the fact that the creditor is aware of the source of funds, unless the principal has contracted with the surety as to the application of such funds and this is known to the creditor"). *See also Warren Brothers Co. v. Sentry Insurance, supra* 13 Mass.App. at 439,

known that contractors such as Precision hold running accounts with material suppliers to which they apply proceeds from current jobs in order to discharge previous, unrelated debts. Finally, we find it significant that Fidelity has not claimed that Pittsburgh acted in a fraudulent manner or in bad faith when it made the application of Precision's payments. As a result, we find that Pittsburgh acted within its rights as a creditor/supplier of Precision.

Based upon the foregoing reasons, we vacate the amended judgment entered by the trial court on June 23, 1986. We reinstate the December 18, 1985 verdict entered by the trial court, holding Fidelity liable to Uhl and Transamerica in the amount of $55,490.00.

433 N.E.2d at 1258; *Templeton v. Sam Klain & Son, Inc., supra* at 1202 (Ind.App.1980).