**NEW TERMINAL STEVEDORING INC., Plaintiff,**

v.

**M/V BELNOR, et al., Defendants.**

**TRUSTEES OF MARITIME ASSOCIATION—ILA PENSION WELFARE & VACATION TRUST, et al., Plaintiffs,**

v.

**NEW TERMINAL STEVEDORING, INC. Defendant,**

v.

**M/V BELNOR, et al., Defendants/Trustees,**

v.

**UNITED STATES of America, Intervenor.**

**Civ. A. Nos. 86–0274–Mc–A, 87–3031–A.**

United States District Court, D. Massachusetts.

June 14, 1989.

Nance Lyons, Comras & Jackman, P.A., Boston, Mass., for Trustees of Maritime Assoc. et al.

Astrid Glynn, Glynn Assoc., Boston, Mass., for New Terminal Stevedoring.

Edward Williamson, Dow, Corluon & Friedman, Houston, Tex., Texas Counsel.

Mary Keane, Tax Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

\* Sitting by designation

1. (a) General rule.—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty

Alexander, Whiteside, Putnam, Bell & Russell, Boston, Mass., for M/V Belnor et al.

## MEMORANDUM AND ORDER

BAILEY ALDRICH, Senior Circuit Judge \*, sitting by designation.

This is an unusual case involving the application of 26 U.S.C. § 6672[1] and a claim that the IRS should credit a payment specifically against a corporate taxpayer's liability for failure to pay over sums withheld from employees' wages pursuant to 26 U.S.C. §§ 3102(a) and 3402(a). Jurgen Schroder, a so-called "responsible" person as an appropriate officer of New Terminal Stevedoring Inc., a Texas corporation, hereinafter New Terminal, became liable to the government under the statute for the unpaid amount. Now out of business, New Terminal is liable also for unpaid corporate taxes. For these Schroder has no responsibility. The single question is whether the net proceeds—now in the custody of the Clerk—of an action successfully maintained in this court by New Terminal against M/V BELNOR for services rendered in Texas in 1984, are to be applied, when received by the government, to reduce the particular indebtedness secured by Schroder's statutory "trust" obligation. The government is admittedly entitled to receive the funds, and it maintains that it is free to allocate them against New Terminal's other obligations, leaving Schroder's trust liability intact.[2] The question is simple, but the answer quite otherwise.

New Terminal ceased doing business after the first quarter of 1985. At this time it had a maritime lien against the BELNOR for stevedoring services, as neither the BELNOR's then, or subsequent owner, had made payment. Learning that the BELNOR was on the east coast, Schroder re-

equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

2. It appears to be common ground that there are insufficient assets to satisfy the government without calling on Schroder's full responsibility if the BELNOR recovery is not credited to him.

tained New York counsel, who, in turn, retained Boston counsel, to make an attachment. The action, 86-0274-Mc-A, was commenced on January 23, 1986. The BELNOR was released on stipulation and, on April 15, 1988, there was a finding for plaintiff for $195,691. On May 18 defendant paid this sum, and minor interest, hereinafter the fund, into court.

Certain Texas judgment creditors of New Terminal having learned of the proceeding, on December 21, 1987, filed in this court civil action 87-3031-A to establish indebtednesses and enable them to reach and apply any recovery in action 0274. They sought injunctive relief against any proceeds of the 0274 action being paid over to New Terminal, and such an order was entered forthwith. In February 1988, the government filed a claim in the 3031 action asserting tax liens allegedly prior to the Texas creditors' judgment liens. It also moved that that action be dismissed for lack of jurisdiction.

In due course the Texas creditors were persuaded that the government's liens were superior to theirs, and exceeded the fund, so that it would be idle for them to remain. 26 U.S.C. § 6323(a). They accordingly departed. The resulting situation is this.

In 1984 and 1985 the government assessed New Terminal for withheld employment tax liabilities. There being no response, by November 1985 notice of the government's liens on all of New Terminal's property and rights to property were properly recorded in Texas. On March 25, 1986, after being apprised of New Terminal's efforts to collect money owed it, the government sent a "Notice of Levy" to New Terminal's New York collecting agent. New Terminal filed this Notice of Levy in this court on December 21, 1987, the same day the Texas judgment creditors brought suit to reach any recovery by New Terminal. On December 23, Schroder notified the IRS of the Texas creditors' suit and urged it "to protect [its] position with respect to the proposed recovery by [New Terminal]." Again, on January 5, 1988, New Terminal's counsel contacted the IRS

to "strongly suggest" that the IRS appear in the action in this court "in order to protect its rights," meaning, of course, to establish its precedence over the Texas creditors who, otherwise had an excellent case. The IRS declined to follow New Terminal's counsel's advice that it appear at a hearing held on January 11, 1988, and on January 25, 1988, the IRS received notice of this court's order that the IRS had 20 days to appear in the Texas creditors' action. On February 10, 1988, in response to this court's order, the government filed its claim against New Terminal. In July, this court denied the government's motion to intervene in the 0274 action and to dismiss the 3031 action, and invited the government to intervene in the 3031 action. On September 16, 1988, the government moved to intervene in 3031 and the motion was allowed on October 5, 1988.

It is the government's position, inter alia, that because it finally appeared in the litigation, it took charge, and is recovering by a lawful right that permits it free use of the fund. Schroder contends that he was the discoverer and obtainer, and, indeed, that some of the proceeds would have been lost, beyond recall, to the Texas creditors if he had not held the fort and summoned the government to establish its priority. The issue is sharp. All of the fund will go to reduce Schroder's trust obligation if his claim succeeds; none of it, otherwise, because of the consuming size of New Terminal's other obligations.

The parties in their briefs focus on whether the eventual payment to the IRS is a "voluntary" or "involuntary" one by New Terminal. New Terminal's argument that the "United States's intervention in this case is not for the aggressive purpose of enabling the United States to collect its delinquent taxes (since [New Terminal] voluntarily instituted this case in order to pay its delinquent taxes), but such intervention was made at the request of [New Terminal] as a defense to the other creditors of [New Terminal]," is a compelling one, but not as to the voluntariness of the payment. *See post.*

■ In assessing the voluntariness of a payment, the proper focus is on the circumstances of the payment to the creditor, and not on the creation of funds used to make the payment. *See In re Bulk Sale of Inventory*, 6 Kan.App.2d 579, 631 P.2d 258, 262 (1981) (although liquidation of assets was voluntary, payments ordered by court in interpleader action were involuntary). Where, as here, the government has not only assessed taxes, filed lien notices, and filed a notice of levy, but has also litigated its right to payment as a party in a suit, a taxpayer would be hard-pressed to argue that the payment received by the government was made voluntarily. *Cf. Muntwyler v. United States*, 703 F.2d 1030, 1033 (7th Cir.1983) (payments pursuant to judicial action are involuntary). Although several cases have held that court action in directing a payment does not show involuntariness by itself, *see* cases cited in *In re A & B Heating & Air Conditioning*, 823 F.2d 462, 463 n. 2 (11th Cir.1987), *vacated and remanded for consideration of mootness*, 486 U.S. 1002, 108 S.Ct. 1724, 100 L.Ed.2d 189 (1988), no cases have been found where a creditor litigated its right to receive payment and the payment was deemed voluntary.

In addition, the Court of Appeals in this circuit recently held that a court "must pay particular attention to an interpretation that a government agency offers of *its own rules and regulations,*" unless it is clearly unreasonable. *In re Energy Resources Co.*, 871 F.2d 223, 229 (1st Cir. 1989) (emphasis in original). The government's position that payments made to it as the prevailing party in litigation are involuntary is not clearly unreasonable and should, therefore, be accepted. *Id.*

■ Determining the payments to be voluntary or involuntary normally resolves who decides as to their application. In recognition of common law principles the IRS's Rule is "where the taxpayer provides specific written instructions for the application of a voluntary partial payment [of withheld employment taxes, the partial payment is to be applied as the taxpayer designates]. If no designation is made by the taxpayer, the Internal Revenue Service will allocate partial payments of withheld employment taxes and collected excise taxes to tax, penalty, or interest in a manner serving its best interest." Rev.Rul. 79–284, 1979–2 C.B. 83, *modifying* Rev.Rul. 73–305, 1973–2 C.B. 43. Obviously it is normally to the IRS's best interest to apply payments to that part of the corporate debt that is not secured by the trust obligation of its "responsible" officers. The IRS policies designed to maximize the public fisc by collecting all taxes due are entitled to great weight. *See In re A & B Heating*, 823 F.2d at 465; *Cf. Muntwyler*, 703 F.2d at 1032 (approving of IRS's "sensible tax policy). Allocation of involuntary payments to non-trust liabilities will, in most cases, increase the United States' opportunity to recover taxes due it in full. *In re Ribs–R–Us*, 828 F.2d 199, 201 (3rd Cir.1987). Except in rare cases, the IRS policy will necessarily lead to the allocation of involuntary payments to non-trust obligations.

■ At the same time, the IRS Rule is not binding on the courts. In *In re Energy Resources*, the Court of Appeals weighed the equities favoring the IRS and the equities favoring an obligee in Chapter 11 reorganization and determined that even though the payment was involuntary within the IRS ruling, the bankruptcy court could properly order that it be applied against the trust obligation. While not similar, there are equities in this case. Action 3031 is itself an equitable proceeding. Schroder, through New Terminal, actively sought funds that could be used to pay New Terminal's tax debts, and, when other creditors threatened those funds, repeatedly, and with the assistance of this court, asked the IRS to intervene. Only after all the marbles had been assembled by Schroder did the IRS scoop enter the case. This situation is in sharp contrast to the classic involuntary payment case. *See, e.g., Liddon v. United States*, 448 F.2d 509, 513 (5th Cir.1971) (where the debtor corporation's counsel "had advised the IRS where funds were available, but had left the collection efforts up to the Government," IRS could clearly apply funds to non-trust obligations), *cert. denied*, 406 U.S. 918, 92

S.Ct. 1769, 32 L.Ed.2d 117 (1972). Schroder, through New Terminal, actively aided the maximization of the IRS's tax collection. Had Schroder known the IRS would apply the proceeds from the M/V BELNOR action to non-trust liabilities, he would have had no incentive to alert the IRS to the threat from the Texas creditors and the funds available for tax purposes would have been depleted. *Cf. Slodov v. United States*, 436 U.S. 238, 251, 98 S.Ct. 1778, 1787, 56 L.Ed.2d 251 (1978) ("Although [the Government's construction of § 6672] might in this case garner tax dollars otherwise uncollectible, its long-term effect arguably would more likely frustrate than aid the IRS's collection efforts.").

Nor can it be said that § 6672 compels allocation of involuntary payments to non-trust obligations. In response to the IRS's arguments that allocation of involuntary payments to trust obligations would frustrate congressional intent, the *Energy Resources* court noted:

> [T]he IRS's argument seems to stand the [strong congressional policy to collect trust liabilities] on its head: The IRS's [involuntary payment] allocation policy and interpretation of Section 6672 does not assure that "trust fund" taxes are promptly turned over to the government. Rather, it ensures that "trust fund" money is paid over *last,* only after all non-trust fund taxes have been paid.

*Energy Resources*, 871 F.2d at 232. *But see In re Avildsen Tools & Machine, Inc.*, 794 F.2d 1248, 1251 (7th Cir.1986) (IRS policy is consistent with the purposes of § 6672).

Where a creditor does not have a "right" to allocate payments, the court may direct "as justice between the parties may require." *See Warren Bros. Co. v. Sentry Ins. Co.*, 13 Mass.App. 431, 435, 433 N.E.2d 1253, 1256 (1982); *United States v. Transamerica Ins. Co.*, 357 F.Supp. 743, 748 (E.D.Va.1973); *Restatement of Contracts* § 393 (1932). A debtor who discovers and saves funds that otherwise would have been lost should have the higher equity. The judgment ordering that the net BELNOR funds be paid over to the IRS should have the appropriate condition directing that they be applied against the obligations covered by 26 U.S.C. § 6672. Admittedly not all would have been lost to other creditors, but there would have been no recovery against the BELNOR at all but for Schroder's activity after New Terminal had gone out of business. This activity should have equitable recognition.

So ordered.