**WESTON GROUP, INC., Petitioner,**

**v.**

**A.B. HIRSCHFELD PRESS, INC., Respondent.**

**No. 91SC565.**

Supreme Court of Colorado, En Banc.

Feb. 16, 1993.

Waldbaum, Corn, Koff and Berger, P.C., Michael H. Berger, Denver, for petitioner.

Elrod, Katz, Preeo, Look, Moison & Silverman, P.C., Jersey M. Green, Denver, for respondent.

Justice LOHR delivered the Opinion of the Court.

In *A.B. Hirschfeld Press, Inc. v. Weston Group, Inc.*, 824 P.2d 44 (Colo.App.1991), the Colorado Court of Appeals affirmed a judgment of the Denver District Court in favor of A.B. Hirschfeld Press, Inc. (Hirschfeld) and against Weston Group, Inc. (Weston) in the sum of $49,312.46 plus interest and costs. In arriving at this result, the court of appeals held that the trial court properly concluded that Weston had entered into a joint venture with Page Gallery Publishing, Inc. (PGP) for the production and marketing of certain National Football League (NFL) team posters, that Weston was liable to Hirschfeld as PGP's joint venturer for debts incurred by PGP under a contract with Hirschfeld for the printing of the NFL posters, and that Hirschfeld properly applied certain payments by PGP to other indebtedness of PGP rather than to the joint venture's obligations. We granted certiorari for the purpose of determining whether the court of appeals was correct in affirming the trial court's ruling that in absence of instructions by PGP as to how payments should be applied, Hirschfeld had the right to apply the payments to PGP's debt in the manner that it did. We affirm the judgment of the court of appeals.

I

In the fall of 1987, PGP was producing sports posters for a chain of pizza parlors called Little Caesars.[1] PGP also owned a license from the NFL to produce and distribute posters of NFL teams. PGP decided that it needed outside assistance to market the NFL posters, and it contacted Weston, a Connecticut based marketing and consulting firm. Weston and PGP entered into an agreement according to which they would share in the profits from anticipated future sales of NFL posters. At the time of the agreement, Weston understood that PGP would have to hire a third party to print the NFL posters. Weston knew of the existence of PGP's Little Caesars poster project but otherwise had nothing to do with that project. In particular, Weston was unaware that PGP had a contract with Hirschfeld for the printing of the Little Caesars posters.

PGP and Hirschfeld agreed that Hirschfeld would print the NFL posters. In early November of 1987, Hirschfeld sent PGP a letter confirming PGP's orders, calculating therefrom the total approximate charges for work done and to be done on the Little Caesars and NFL posters, and setting out a required payment schedule. The letter stated that the total approximate printing charges would be $144,064.00, that a payment of $45,000.00 had been received by Hirschfeld on November 4, that payments of $22,000.00, $18,500.00, and $6,300.00 were due by November 6, November 9, and November 12, 1987, respectively, and that any remaining balance was due by December 28, 1987. PGP contacted Weston, and Weston agreed to loan PGP $46,800.00, to be advanced to PGP according to a November schedule that corresponded almost identically with the November payment schedule set forth in Hirschfeld's letter to PGP. PGP then made additional payments of $45,450.00 to Hirschfeld in November, and PGP did not instruct Hirschfeld on how to apply any of PGP's November payments. Because the Little Caesars account was the earlier matured debt,[2] Hirschfeld applied significant portions of PGP's November payments to that debt, with the result that $49,312.46 remained outstanding on PGP's NFL poster account, and nothing remained outstanding on PGP's

---

**1.** We derive the facts from the findings of the trial court, supplemented by undisputed evidence in the record.

**2.** *See infra* note 4.

Little Caesars poster account.[3] The joint venture between PGP and Weston was a failure, and PGP did not make its final payment to Hirschfeld.

In an attempt to collect from PGP the entire amount that PGP owed, Hirschfeld brought suit on March 14, 1988, against PGP and two of PGP's principals who had personally guaranteed PGP's debt to Hirschfeld. During a deposition of one of those principals on August 11, 1988, Hirschfeld learned for the first time that PGP and Weston may have been joint venturers with respect to the production and marketing of the NFL posters. Hirschfeld consequently moved to amend its complaint to add Weston as a defendant, and it also moved for an order consolidating its case with a pending action brought by Weston in Denver District Court to recover sums owing on PGP's promissory note. The trial court denied Hirschfeld's motion to consolidate, but it granted Hirschfeld's motion to amend its complaint to include Weston. A bench trial was conducted on October 30 and 31, 1989, and on November 1, 1989, the trial court issued its findings of fact and conclusions of law. It held that PGP and Weston were joint venturers, that Hirschfeld had a right to apply PGP's November payments as it did, and that Weston was liable to Hirschfeld in the sum of $49,-312.46[4] plus interest and costs. Subsequently, a final judgment was entered against Weston,[5] and Weston filed a notice of appeal.

The court of appeals affirmed the trial court's holding that PGP and Weston were joint venturers, and held that because the expenses of printing the NFL posters "were within the scope of the [joint venture] agreement, PGP had authority to bind the joint venture even absent Hirschfeld's reliance on the venture." *Hirschfeld Press*, 824 P.2d at 47. The court also held that in light of *Jackson v. A.B.Z. Lumber Co.*, 155 Colo. 33, 392 P.2d 288 (1964), the trial court did not err in permitting Hirschfeld to apply as it did the November payments in question. The court went on to explain that if it applied sections 259 and 260 of the *Restatement (Second) of Contracts* (1979),[6] then Hirschfeld's application of the payments would not be legally effec-

---

3. These figures indicate that PGP's total bill was $139,762.46, against which $90,450.00 in November payments were applied, resulting in a final outstanding balance of $49,312.46. Although the trial court made no finding regarding the total amount that PGP owed for the Little Caesars posters, the record suggests that before Hirschfeld applied part of the November payments to that debt, PGP owed a total of $38,865.00 for the Little Caesars posters. *See infra* note 4.

4. Weston did not challenge the accuracy of this or related figures on appeal, and neither party challenged on appeal the accuracy of the trial court's determination that PGP's debt for the Little Caesars posters matured earlier than its debt for the NFL posters. Accordingly, we accept these findings on certiorari review as part of the settled law of the case.

5. The court noted that PGP and its principals had filed for bankruptcy and that based on proceedings in the bankruptcy court and a motion by Hirschfeld in the present case, dismissal of all claims between PGP and its principals on the one hand and Hirschfeld on the other was appropriate. The court ordered those claims dismissed with prejudice and also directed entry of final judgment on Hirschfeld's claim against Weston in compliance with C.R.C.P. 54(b).

6. § 259 provides in relevant part:

(1) Except as stated in Subsections (2) and (3), if the debtor has not directed application of a payment as between two or more matured debts, the payment is applied according to a manifestation of intention made within a reasonable time by the creditor to the debtor.
(2) A creditor cannot apply such a payment to a debt if
 (a) the debtor could not have directed its application to that debt,....

§ 391 of the *Restatement (First) of Contracts* (1932), which was in effect when *Jackson* was decided, also contained a provision requiring that a creditor seasonably manifest intent to a debtor in order to effect an application of a payment. *See infra* note 12.

§ 260 provides in relevant part:

(1) If neither the debtor nor the creditor has exercised his power with respect to the application of a payment as between two or more matured debts, the payment is applied to debts to which the creditor could have applied it with just regard to the interests of third persons, the debtor and the creditor.
(2) In applying payments under the rule stated in Subsection (1), a payment is applied to the earliest matured debt and ratably among debts of the same maturity, except that preference is given

tive. *Hirschfeld Press,* 824 P.2d at 47. The court's theory was that because Hirschfeld did not notify PGP of its intention to apply the payments as it did, Hirschfeld's application was ineffective under section 259,[7] and that section 260 applied instead. *Id.* Under section 260, a court applies payments according to the equities of the case, *Restatement (Second) of Contracts* § 260(1), but preference is given "to a debt that the debtor is under a duty to a third person to pay immediately." *Id.* § 260(2)(a). With regard to the cost of printing the NFL posters, the court of appeals determined that PGP had such a duty to Weston. *Hirschfeld Press,* 824 P.2d at 47. Consequently, the court concluded that if section 260 governed, then it must apply the November payments entirely to PGP's NFL poster debt before it could apply them to PGP's Little Caesars poster debt, with the result that little or nothing would remain outstanding on the NFL poster debt. The court of appeals declined, however, to apply either section 259 or section 260, because, in its view, those sections are inconsistent with our holding in *Jackson. Id.* at 47–48.

 We hold that it was unnecessary for Hirschfeld to manifest its intent to PGP

identifying the debts to which Hirschfeld intended to apply PGP's payments in order to make Hirschfeld's application of those payments effective. In so holding, we decline to adopt the manifestation of intent requirement set forth in section 259(1) of the *Restatement (Second) of Contracts.* As a result of this determination, we conclude that the court of appeals reached the correct result in deciding that Hirschfeld had the right to apply PGP's payments as it did and that judgment was properly entered against Weston for the unpaid printing costs.[8]

## II

 A review of existing case law concerning the application of payments by a debtor who owes more than one debt to a creditor will provide necessary background for resolution of the present controversy. It is well established that, generally, a debtor owing more than one debt to a creditor has the right to designate the debt to which a payment shall be applied. *Jackson,* 155 Colo. at 36, 392 P.2d at 290 (citing authorities including § 387, *Restatement (First) of Contracts* (1932)); *Mumm v. Taylor,* 121 Colo. 157, 163, 213 P.2d 836,

---

(a) to a debt that the debtor is under a duty to a third person to pay immediately,....
§ 394 of the *Restatement (First) of Contracts* (1932) is similar to § 260 of the *Restatement (Second) of Contracts* (1979) with respect to application of payments, undesignated by either the creditor or the debtor, to debts that the debtor is obligated to a third party to pay. It provides in pertinent part:
(1) Where neither the debtor nor the creditor seasonably exercises his power to apply a payment to one of several debts, the payment is applied to the earliest matured debt to which the creditor might have applied it, except that application is made to
(a) a matured debt which the debtor is under a duty to a third person immediately to pay, rather than to one where he is under no such duty; ...

7. As the language of § 259 suggests, *see supra* note 6, application of a payment by a creditor under § 259 "is not effective unless within a reasonable time the creditor notifies the debtor or otherwise manifests to him his intention to make the application." *Restatement (Second) of Contracts* § 259 cmt. b.

8. The court of appeals apparently believed that the rules articulated in *Jackson* and in the *Restatement* yield different results in this case and considered itself bound to follow *Jackson.* Although in view of our resolution of the issues the correctness of this conclusion is not important, we do note that the record is insufficient to determine whether there would be a difference. If analyzed under *Restatement* principles, it would be necessary to determine whether Hirschfeld notified PGP of its intention to apply the payments as it did in order to determine whether such application was effective. *See* § 259(1) of the *Restatement (Second) of Contracts.* If Hirschfeld did not notify PGP, then it would be necessary to determine whether PGP had a duty to Weston to apply the payments to the NFL poster account, *see* § 260(2)(a) of the *Restatement (Second) of Contracts,* and whether Weston was a "third person" with respect to PGP, *see id.* These determinations require resolution of issues of fact and law not addressed by the trial court.

840 (1950); *accord First Nat'l Bank in Palm Beach v. United States*, 591 F.2d 1143, 1147 (5th Cir.1979); *St. Paul Fire and Marine Ins. Co. v. United States for the Use of Dakota Elec. Supply Co.*, 309 F.2d 22, 24–25 (8th Cir.1962), *cert. denied*, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); *Warren Bros. Co. v. Sentry Ins.*, 13 Mass.App. 431, 433 N.E.2d 1253, 1255 (1982); *Restatement (Second) of Contracts* § 258(1); 15 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 1795 (3rd ed. 1972); 5A Arthur L. Corbin, *Corbin on Contracts* § 1231 (1964).[9] If the debtor does not direct how the payment is to be applied, then the creditor generally may apply the payment in any way that the creditor desires. *Jackson*, 155 Colo. at 36–37, 392 P.2d at 290–91; *McBride v. Noble*, 40 Colo. 372, 374, 376, 90 P. 1037, 1038 (1907); *accord First Nat'l Bank in Palm Beach*, 591 F.2d at 1147–48; *St. Paul Fire and Marine Ins., Co.*, 309 F.2d at 25; Williston, *supra*, §§ 1796, 1797; Corbin, *supra*, § 1231. An exception to this latter rule is that if the creditor knows or should know that the payment should be applied in a particular way to protect the interest of a third person, then the creditor must apply the payment in accordance with that interest. *Jackson*, 155 Colo. at 37, 392 P.2d at 291.[10]

If neither the debtor nor the creditor exercises its right to direct application of a payment, then the payment is applied by law in order of time to the earliest matured debts. *Mackey v. Fullerton*, 7 Colo. 556, 559, 4 P. 1198, 1200 (1884); *West Denver Feed Co. v. Ireland*, 38 Colo.App. 64, 68, 551 P.2d 1091, 1094 (1976).[11]

■ In the case before us, the record is clear that PGP did not instruct Hirschfeld on how to apply any of PGP's November payments. In addition, the record is clear that at all relevant times Hirschfeld did not know, nor did it have reason to know, that PGP had a duty (if PGP did have a duty) to Weston to apply the payments differently than Hirschfeld applied them. Hirschfeld therefore had a right to apply the payments as it did, which, in this case, was to the earliest matured debts of PGP.

### III

Weston, however, urges us to adopt section 259(1) of the *Restatement (Second) of Contracts*, which requires that in the absence of designation by a debtor, a creditor can apply payments among matured debts as it chooses only if the creditor manifests its intention to the debtor within a reasonable time concerning the manner of applica-

9. A suggested exception to this rule is that if a debtor is under a duty to a third person to direct that a payment be applied to a particular debt, *and* the creditor knows or has reason to know this, then contrary directions given by the debtor to the creditor are ineffective, and the creditor must apply the payment in accordance with the debtor's duty to the third person. *See Restatement (Second) of Contracts* § 258(2). *Cf. Jackson*, 155 Colo. at 37, 392 P.2d at 291 (holding that if a debtor does not direct how a payment shall be applied, then the creditor must apply it in accordance with the debtor's duty to a third person if the debtor is under a duty to the third person to direct that the payment be applied to a particular debt and the creditor knows or has reason to know this).

10. Other exceptions that we have noted are that a creditor "cannot make an inequitable or unconscionable application," or "make the applica-

tion to an illegal debt, or one contracted against public policy." *McBride*, 40 Colo. at 376, 90 P. at 1038. Also, in *Perot v. Cooper*, 17 Colo. 80, 86, 28 P. 391, 393 (1891), we noted that "an undesignated payment will be applied to an interest bearing demand rather than to one not bearing interest," apparently based on a presumed but unarticulated intent of the debtor. Thus, the right of a creditor to apply undesignated payments as it sees fit is subject to some equitable limitations.

11. There may be circumstances in which equitable considerations would require a different application of payments in absence of direction by either the debtor or the creditor. *See St. Paul Fire and Marine Ins., Co.*, 309 F.2d at 25; *Warren Bros.*, 433 N.E.2d at 1255; *Alside Supply Center v. Vinson*, 802 S.W.2d 632, 635 (Tenn. App.1990); *Restatement (Second) of Contracts* § 260(2); Corbin, *supra*, § 1231.

tion of the payments.[12] Weston argues that Hirschfeld did not produce evidence that it manifested its intent to PGP as to the application of PGP's payments, and therefore the principles of section 260 of the *Restatement (Second) of Contracts* should govern the application of the payments. Hirschfeld contends that to follow section 259(1) would be inconsistent with our decision in *Jackson*. Although we do not agree that *Jackson* necessarily precludes adoption of the manifestation of intent requirement in section 259(1) of the *Restatement (Second) of Contracts*, we decline to adopt that requirement for other reasons.

In *Jackson*, a subcontractor named Duffy already had an unsecured, delinquent account of $2,415.75 with A.B.Z. Lumber Co. (A.B.Z.)[13] when he charged another $681.13 worth of materials for use in remodelling the Jacksons' home. The general contractor on the Jackson project then paid Duffy in full for his work, and Duffy used this money to reduce his account with A.B.Z. by $2,300.00. Duffy did not instruct A.B.Z. on how to apply the payment to his account, and A.B.Z. applied it to Duffy's older delinquent charges, leaving a balance outstanding for the Jackson materials. Duffy never paid this balance, and A.B.Z. brought suit against the Jacksons to foreclose a statutory materialman's lien on the Jacksons' home. We stated that, generally, "a debtor owing more than one debt to a creditor has the right to direct to which debt the payment shall be applied." *Jackson*, 155 Colo. at 36, 392 P.2d at 290. In the absence of direction by the debtor as to how the payment shall be applied, we further stated that, apart from "some well recognized exceptions ... which the facts of this case bring into play," *id.* at 37, 392 P.2d at 291, the rule is that "[t]he creditor

is allowed to make the appropriation in a way most advantageous for himself." *Id.* at 37, 392 P.2d at 290. The particular exception raised in *Jackson* was that if a creditor knows or should know of an interest of a third person, then the creditor must apply the payment in accordance with that interest. *Id.* at 37, 392 P.2d at 291. Because A.B.Z. knew or should have known that Duffy had reduced his account with funds from the Jackson remodeling job, *id.* at 39, 392 P.2d at 291, we held that the payment should have been applied to the debt for materials used on that job and therefore reversed the judgment of foreclosure. *Jackson* did not involve the issue of whether a creditor must manifest its intent to the debtor concerning application of undesignated payments as a condition to effectiveness of such payments. Therefore, we do not read *Jackson* as necessarily having resolved that issue.

It must be noted, however, that in a line of cases originating before the beginning of the twentieth century, we have recognized the general rule to be that in absence of designation by a debtor, the creditor generally may apply the debtor's payments among matured debts in any way the creditor desires. *Jackson*, 155 Colo. at 36–37, 392 P.2d at 290–91; *McBride*, 40 Colo. at 374, 376, 90 P. at 1038; *Perot v. Cooper*, 17 Colo. 80, 86, 28 P. 391, 393 (1891); *Mackey v. Fullerton*, 7 Colo. 556, 559, 4 P. 1198, 1200 (1884). None of those cases has suggested a requirement that the creditor manifest its intention to the debtor, even though section 391 of the *Restatement (First) of Contracts* (1932), which had been published long before *Jackson* was decided, contained such a requirement. In the absence of such a suggestion, we believe that our cases can most reasonably be read not to impose a requirement of manifestation

---

**12.** § 391 of the *Restatement (First) of Contracts* (1932), which was the edition of the *Restatement* in effect when *Jackson* was decided, contained a like requirement. It provided:

Where a creditor has power to make application of a payment he can exercise the power only by sending seasonable notification to the

debtor, or by some manifestation to him indicating the application.

**13.** A.B.Z. "had lost its lien rights on the delinquent account." *Jackson*, 155 Colo. at 39, 392 P.2d at 291.

of the creditor's intent in order to make the creditor's application of the debtor's payments effective. This is an area of the law in which special importance attaches to the clarity and stability of rules, for predictable consequences are important in conducting commercial transactions. If, as we believe, creditors have been led to rely on the absence of a requirement of manifestation of intent as a condition to effectiveness of the application of an undesignated payment by a debtor, we are reluctant to deny that reliance its intended consequence. Furthermore, the dearth of cases presenting this issue during the period of more than a century during which cases involving application of payments on multiple obligations have come before appellate courts in this state suggests that the absence of a manifestation of intent requirement has presented no significant impediment to the conduct of commercial transactions. For these reasons, we decline to adopt the manifestation of intent requirement set forth in section 259(1) of the *Restatement (Second) of Contracts*.

## IV

Hirschfeld did not know or have reason to know of the relationship between PGP and Weston. PGP did not designate how its payments should be applied. Hirschfeld, therefore, had the right to apply them as it did even in the absence of manifestation of intent to PGP as to the manner of application.

We affirm the judgment of the court of appeals.

SCOTT, J., does not participate.